STANLEY A. GINSBERG et al., Respondents, v. YESHIVA OF FAR ROCKAWAY, Appellant.

Second Department, July 8, 1974.

*Gladstone, Lowell, Karassik & Mondschein* (*Stanley H. Lowell* and *Frank A. Romano* of counsel), for appellant.

*Tenzer, Greenblatt, Fallon & Kaplan* (*Edward L. Sadowsky* of counsel), for respondents.

LATHAM, J.  In this action to enjoin the operation of a religious school on property subject to a private residential use covenant, the issue is whether there is a violation of the constitutional guarantees of religious freedom by the enforcement of the covenant against the defendant, which purchased with knowledge of the covenant and of the plaintiffs' intention to enforce it.

In 1908, a covenant was attached to six lots, three on the north side and three on the south side of a short dead-end street (now named Virginia Street) off Empire Avenue, which is a well-traveled two-lane street in Far Rockaway, Queens.  The defendant's property is situated at the dead end, where all traffic, including emergency vehicles, turns around.  The covenant provides in pertinent part that none of the six lots " shall be used except for one private residence" and that no " apartment buildings, boarding houses, stores, business houses, barns or stables " shall be " erected or maintained ".  Of the six restricted lots, the four corner ones are improved with single-family residences while the two middle lots are vacant.  The surrounding area contains one-family homes in all directions, with the exception of a few two-family homes and a four-story apartment house, all of which have been there for many years.

Plaintiffs Dr. Stanley A. and Mrs. Susan K. Ginsberg own and reside in a single-family home on the *restricted* southeast corner lot.  Dr. Ginsberg uses part of the house as a medical office 12 hours a week.  His father, who was also a physician, lived and practiced in the house from 1932 on.  Dr. Ginsberg started his practice in 1964, paying rent for the office first to his father and then, after his father's death, to his mother.  In 1969, his mother transferred the house to the plaintiffs.

In or about 1963, an orthodox synagogue purchased the adjacent *unrestricted* property south of the plaintiffs', demolished two private dwellings, and erected its temple.  At the same time, the synagogue bought the adjacent vacant *restricted* lot west of the plaintiffs', paved and lighted it, and used it as a parking lot without objection from the plaintiffs or their predecessors apart from minor complaints as to fencing and lighting which were modified pursuant to the plaintiffs' request.  Synagogue traffic enters the parking lot through Virginia Street and exits

directly onto Empire Avenue by the driveway on the *unrestricted* portion of the synagogue's premises, thus not clogging Virginia Street or substantially disturbing the one-family residential atmosphere. The Trial Justice believed Dr. Ginsberg's statement that the use of the lot for parking was not offensive to him.

In August, 1971, concededly with knowledge of the covenant and of the plaintiffs' intention to enforce it, the defendant, Yeshiva of Far Rockaway, apparently not affiliated with the synagogue, purchased the *restricted* northwest corner lot at the dead end of the block diagonally across from the plaintiffs. On the eve of purchase, the plaintiffs' attorneys advised the defendant of the plaintiffs' intention to enforce the covenant. In September, 1971, the defendant began to operate an all-day religious school in the former private dwelling for grades 9 through 12. The original nine rooms, unchanged, now serve as four classrooms, an office, a prayer room where the boys pray in the morning and the evening, and a kitchen, with two of the rooms used as a dormitory for three out-of-town boys. The hours are 9 A.M. to 6 P.M. Monday through Friday, with additional hours on Sunday mornings and meetings on Thursday evenings. There are 47 students ages 14 to 18 and some eight teachers. Dr. Ginsberg has been disturbed by the students playing roller skate hockey on the parking lot and in the street in the late afternoon and early evening and by the frequent failure of the school to remove some 8 to 10 garbage cans from the street for several days after collection.

The plaintiffs commenced this action to enforce the covenant on or about February 1, 1972. In or about March, 1972, the defendant purchased the adjoining vacant *restricted* lot. It plans to further expand the school. Though the record is barren with respect to a connection between the synagogue and the school, it is apparent that a synagogue and a yeshiva are both identified with the Jewish faith.

The trial court found that despite the synagogue's use of one lot as a parking lot and some deterioration in the residential character of the area, the area retains a residential character of substantial value. This value will be adversely affected by the presence of groups of students of high school age and by the use and servicing of the school property by persons other than private residents. In reliance on *Evangelical Lutheran Church* v. *Sahlem* (254 N. Y. 161), the trial court enjoined the operation of the school.

On appeal, the defendant seeks to distinguish *Sahlem* on the ground that in that case the covenanted area was exactly the

same as when the restriction was placed on the land, while at bar, as contended by the defendant, there has been substantial change. The defendant *inter alia* argues that, in balancing the equities, religious corporations should be distinguished from commercial enterprises (cf. *Matter of Westchester Reform Temple* v. *Brown*, 22 N Y 2d 488, 493).

It has long been the rule in this and other jurisdictions that residential use covenants are enforceable against religious institutions such as churches and synagogues (*Evangelical Lutheran Church* v. *Sahlem*, 254 N. Y. 161, *supra*; Ann. 13 ALR 2d 1239; ALR 2d Later Case Service; 12 Syracuse L. Rev. 347). Chief Judge CARDOZO, speaking for the Court of Appeals, said (p. 168): "Neither at law nor in equity is it written that a license has been granted to religious corporations, by reason of the high purpose of their being, to set covenants at naught. Indeed, if in such matters there can be degrees of obligation, one would suppose that a more sensitive adherence to the demands of plighted faith might be expected of them than would be looked for of the world at large." In that case, as at bar, the plaintiff, with knowledge of the restrictive covenants and of the defendant's opposition, purchased land opposite the defendant's and sought to build a church. In the absence of proof that "the character of the neighborhood has so changed as to defeat the object and purposes for which the restrictions were imposed", the Court of Appeals declared the covenants enforceable both at law and in equity (*Sahlem, supra*, p. 166). The facts at bar are entirely similar to those in *Sahlem*, with the added circumstance that the *purchaser here is a school, not a church or synagogue. Sahlem is clearly dispositive.*

The dissenters, ignoring the limits of both the briefs and the arguments before the trial court, attack the viability of *Sahlem* in the light of more recent decisions with regard to zoning and restrictive covenants.

Clearly, however, zoning is an aspect of the police power, asserted for the general welfare, and must bear a substantial relation to the public health, safety, morals, or general welfare (*Euclid* v. *Ambler Co.*, 272 U. S. 365). It is conceded that *all schools*, public and private, and religious institutions are protected from the full impact of *zoning* restrictions because of their contribution to the public welfare (1 Anderson, New York Zoning Law and Practice [2d ed.], pp. 435, 462–463; *Matter of Diocese of Rochester* v. *Planning Bd. of Town of Brighton*, 1 N Y 2d 508, 526). While the Court of Appeals has stated that a municipality's lack of power to limit the use or erection of

structures for churches and synagogues is founded on the constitutional guarantees of freedom of worship (*Matter of Community Synagogue* v. *Bates,* 1 N Y 2d 445, 458; *Matter of Westchester Reform Temple* v. *Brown,* 22 N Y 2d 488, 496, *supra*), at the same time the court noted that appropriate restrictions may nevertheless be imposed on churches and schools and they may also be excluded (*Matter of Diocese of Rochester* v. *Planning Bd. of Town of Brighton,* 1 N Y 2d 508, 526, *supra; Matter of Westchester Reform Temple* v. *Brown,* 22 N Y 2d 488, 497, *supra*).

There is a fundamental distinction between zoning restrictions and private covenants. Zoning is an *encroachment* on private property rights and its enforcement requires the justification of an overriding public interest. In contrast, the restrictive private covenant *is itself a property right and its subordination to the right of the purchaser is "condemnation without authority of law"* (*Christ's Methodist Church* v. *Macklanburg,* 198 Okla. 297, 300 [emphasis added] ).

Reliance by the dissenters on *Shelley* v. *Kraemer* (334 U. S. 1) is completely misplaced. Unlike the restrictions at bar, the covenants considered in *Shelley* were racially discriminatory on their face, as clearly and directly pointed out in *Ireland* v. *Bible Baptist Church* (480 S. W. 2d 467 [Tex.], cert. den. *sub nom. Bible Baptist Church* v. *Ireland,* 411 U. S. 906).*

Furthermore, the Supreme Court of the United States has shown little disposition to extend *Shelley* (70 Harv. L. Rev. 1428, 1437, citing *Black* v. *Cutter Labs.,* 351 U. S. 292 and *Rice* v. *Sioux City Cemetery,* 349 U. S. 70).

The dissenters' reliance on *Marsh* v. *Alabama* (326 U. S. 501) is also misplaced. In *Marsh,* a company-owned town sought to ban the distribution of religious literature on a sidewalk in its shopping district. The town and its shopping district were accessible to and freely used by the public in general. In reversing a conviction for criminal trespass, the Supreme Court merely held that people who live in company towns have the obligations of all other citizens and the consequent need for uncensored information. The case is inapposite.

It must further be observed that even in zoning, exclusion of religious institutions is not impossible. The availability of alter-

---

* Cf. *West Hill Baptist Church* v. *Abbate* (53 Ohio Op. 2d 107, 112) where two churches of other religious denominations had been erected in the large restricted area and the court said: " The appearance of discrimination in favor of certain religious denominations  *  *  * is given by the existence of these churches  *  *  * the presence of these two churches in this area indicates that a choice was made by the beneficiaries of the covenant between denominations."

native locations would be a highly relevant consideration (70 Harv. L. Rev. 1428, 1436). The ordinance may be constitutional while the particular application is not (*Matter of Westchester Reform Temple* v. *Brown,* 22 N Y 2d 488, *supra*).

To support their argument that the defendant's school is such an exercise of religion as renders unenforceable the plaintiffs' property right, the dissenters rely on a decision which held that parochial schools involve sufficient religious activity and purpose to invalidate State aid (*Lemon* v. *Kurtzman,* 403 U. S. 602). However, it requires very little religious activity to run afoul of the Establishment Clause. A short daily prayer is an impermissible religious activity for a public school (*Abington School Dist.* v. *Schempp,* 374 U. S. 203), but no one argues that the same daily prayer converts the public school to a religious school.

In the face of its conceded knowledge of the covenant and the warning on the eve of purchase that the plaintiffs would enforce their rights, the defendant purchased the *restricted* corner lot and immediately opened its school. Six months later, despite the commencement of this action, the defendant arrogantly purchased the adjoining *restricted* lot with admitted plans to expand.

The area subject to the covenant is limited to six lots on one short block terminating in a dead end. There is no claim by the defendant that it is excluded from a larger nearby area by the operation of similar restrictions. On the contrary, the neighboring synagogue purchased *unrestricted* property adjacent to the plaintiffs' and demolished two private residences to construct its building. Nor does the defendant school claim that the property in question is particularly suited to its purpose, that it possesses some unique advantage for the operation of its school. The facts are contrary. The probable need for emergency vehicles is much greater in an expanding school with a present population of some 60 students and teachers than it is in a one-family residence, while a building located at the blind end of a dead-end street is less accessible than one on an open street.

In this short dead-end street, noise pollution is magnified and contained. Should the plaintiffs and others who bought in reliance on the restrictive covenant be helpless to protect themselves? No balancing of constitutional rights can support such a conclusion on the facts at bar.

The judgment and order should be affirmed, with one bill of costs.

BENJAMIN, J. (dissenting). In this action to enjoin violation of a covenant limiting the use of each of six plots of land to

"one private residence, to cost not less than $5,000" and barring the erection or maintenance on any of the plots of "any apartment buildings, boarding houses, stores, business houses, barns or stables", the defendant appeals from a judgment granting such injunction and from an order denying its motions to set aside the decision after trial.

The six plots are located three on each side of a short dead-end street, Virginia Street, which runs at right angles off Empire Avenue, a well-traveled street. The plaintiffs are the owners and occupants of a one-family 14-room house on one corner of Empire Avenue and Virginia Street which they use as their family home, and the plaintiff husband, a urologist, also uses part for his office, the entrance to the office being on Empire Avenue and the main entrance to the house being on Virginia Street. The house had been owned by the plaintiff doctor's father, who had lived and practiced there from 1932 until his death in 1965. In 1964 the plaintiff doctor began to practice at the same premises, paying rent therefor first to his father and later to his mother until 1969, when his mother transferred the house to the plaintiffs.

In or about 1963, an orthodox synagogue purchased non-restricted property adjacent to the plaintiffs' plot and the two other restricted plots adjoining it on the same side of Virginia Street and built a synagogue on the property. It also purchased the vacant restricted lot adjacent to the plaintiffs' and paved and lighted it and used it as a parking lot for those using the synagogue. In August, 1971, the defendant yeshiva, concededly with knowledge of the restrictive covenant, purchased the home and plot at the inner end of Virginia Street on the side opposite the plaintiffs' home and began soon after to operate a full-time religious school in the one-family residence it had purchased. In or about March, 1972, after the instant action was commenced, the defendant purchased the vacant plot alongside the one it owns and it plans to expand its school.

The issue raised in this appeal is whether the State power may be invoked by way of injunction against the defendant yeshiva to prevent it from using its premises, which are subject to the above-mentioned covenant restricting them to one-family residential use, to operate a religious school thereon. We believe such a use of State power violates the constitutionally protected status religious structures enjoy under the First Amendment made applicable to the States by the Fourteenth Amendment. I therefore think the judgment and order appealed

from should be reversed and that judgment should be granted in favor of the defendant.

In our State the question of the impact of the constitutional guarantees of the free exercise of religion and enjoyment of religious profession (N. Y. Const., art. I, § 3) on zoning ordinances limiting the use of real property in a designated area to residential use only has been considered in several cases. In those cases it has been held " that religious structures cannot be excluded, directly or indirectly, from residential zones " (*Matter of Westchester Reform Temple* v. *Brown*, 22 N Y 2d 488, 496). In that case Judge KEATING, speaking for a unanimous court said (p. 496) : " We have said that factors such as potential traffic hazards, effects on property values and noise and decreased enjoyment of neighboring properties cannot justify the exclusion of such structures."

The decision in *Brown* cited with approval *Matter of Community Synagogue* v. *Bates* (1 N Y 2d 445), which had ruled that the zoning power of the Village of Sands Point did not authorize it to limit the erection or use of structures for public worship and strictly religious uses. *Brown* also cited and relied on *Matter of Diocese of Rochester* v. *Planning Bd. of Town of Brighton* (1 N Y 2d 508), which involved an effort by the petitioning diocese to obtain permission to erect a church and parochial school with necessary accessory uses on certain property which was located in an area zoned for residential use. The respondent Town Planning Board and Board of Appeals refused permission because (1) the locale was " strictly residential in character ", (2) " churches and schools should be built in areas where future residential development could accommodate itself to the church or school " and (3) " good planning requires the maintenance of larger and more expensive homes which bear higher assessed values " (p. 517).

In rejecting these grounds and annulling the decisions of the respondents, the Court of Appeals, after noting that it is well established that a zoning ordinance which wholly excludes a church or synagogue from any residential district " is stricken on the ground that it bears no substantial relation to the public health, safety, morals, peace or general welfare of the community " (p. 522), concluded that the decisions of the respondents denying the petitioner permission to build a church and parochial school on its property " *bear no substantial relation to the promotion of the public health, safety, morals or general welfare of the community* " and must therefore be annulled (p. 526; emphasis in original). The court also said (p. 526) : " Thus

church and school and accessory uses are, in themselves, clearly in furtherance of the public morals and general welfare. The church is the teacher and guardian of morals (*State ex rel. Synod of Ohio* v. *Joseph,* 139 Ohio St. 229, *supra*), and ' an educational institution, whose curriculum complies with the state law, is considered an aid to the general welfare ' (*Archbishop of Oregon* v. *Baker,* 140 Ore. 600, 613, *supra*). These proposed structures will not interfere with the public health, nor can they be said to be a danger to the public peace or safety; if they were, the ordinance would not have permitted their location in the district.''

In the instant case we are dealing not with a synagogue but with an all-day religious school. That such a school constitutes an integral part of the religious mission of its sponsors and is therefore an exercise of religion protected by the State and Federal Constitutions is made clear in *Lemon* v. *Kurtzman* (403 U. S. 602, 616), where Chief Justice BURGER, speaking for the court said, ''parochial schools involve substantial religious activity and purpose.''

Nor in this case are we dealing with the constitutional validity of an exercise of the police power based upon a local legislative determination as to possible damage to the public health and welfare resulting from permittting a structure to be used for religious purposes to be located in an area reserved for residential use. Rather we are dealing with a demand by an owner of land subject to a restrictive covenant that the covenant be enforced against other land made subject to that covenant by a previous owner. While the plaintiffs seeking the injunction stand primarily on the letter of their covenant, they do by their proof seek to establish that the operation of the defendant's school does somewhat inconvenience them in their use of their premises. Plaintiffs make no claim that the public welfare will be adversely affected by the operation of the defendant's religious school. The trial court found that the value of the plaintiffs' premises will be adversely affected by the presence of groups of students. But such a claim of inconvenience and possible adverse effect on the value of the plaintiffs' premises, a conclusion not supported by any proof in the record, can hardly be given more weight in the balance against the preferred position given to the free exercise of religion by our Constitution than our Court of Appeals gave in the *Diocese of Rochester* case (1 N Y 2d 508, *supra*) to a legislative finding that the public welfare will be disserved by the erection of a church and religious school in an area reserved for residential use.

It might be argued that we are faced here with a simple question of enforcing a private contract between private parties and hence the Fourteenth Amendment which is limited to State action cannot serve to raise the First Amendment issue of free exercise of religion. *Shelley* v. *Kraemer* (334 U. S. 1) and its progeny, *Hurd* v. *Hodge* (334 U. S. 24) and *Barrows* v. *Jackson* (346 U. S. 249), dispose of that contention. *Shelley* established the doctrine that State court enforcement of a racially discriminatory restrictive covenant is State action subject to the Fourteenth Amendment, and any contention that *Shelley* is limited to matters of racial and even religious discrimination falls before *Marsh* v. *Alabama* (326 U. S. 501), where the Supreme Court of the United States struck down an effort to use State power to compel compliance with a ban by a privately-owned town against distribution of religious literature on its streets, declaring it a violation of the First and Fourteenth Amendments and saying (p. 509) : " When we balance the Constitutional rights of owners of property against those of the people to enjoy freedom of press and religion, as we must here, we remain mindful of the fact that the latter occupy a preferred position."

The foregoing authorities require us to reverse the judgment appealed from. Nor does *Evangelical Lutheran Church* v. *Sahlem* (254 N. Y. 161), cited and relied on by the plaintiffs, compel a contrary conclusion. That case was decided in 1930, long before the decisions in *Marsh* v. *Alabama* and *Shelley* v. *Kraemer* (*supra*), expanding the scope of the Fourteenth Amendment to the First Amendment guarantee of free exercise of religion and declaring State court enforcement of private agreements to be State action subject to the Fourteenth Amendment. Further, the issue of the constitutionality of a ruling against the plaintiff church was not raised in *Sahlem*. In our view the doctrine established in *Sahlem* no longer has application to the case before us.

GULOTTA, P. J., and COHALAN, J., concur with LATHAM, J.; BENJAMIN, J., dissents and votes to reverse and to grant judgment in favor of defendant, with an opinion, in which MUNDER, J., concurs..

Judgment of the Supreme Court, Queens County, dated July 27, 1973, and order of the same court, dated September 11, 1973, affirmed, with one bill of costs.