Jones, J.
(dissenting). We think the time has come and that this is an appropriate case in which to breathe vitality into the so far lifeless words of Judge Froessel that, notwithstanding that churches, with schools, enjoy a favored status in the law of zoning, nonetheless, they can be held subject to "appropriate restrictions” (Matter of Diocese of Rochester v Planning Bd., 1 NY2d 508, 526). In our view New York should approach the position taken by the growing number of States holding what has been termed the "minority view” (1 Rathkopf, Law of Zoning and Planning [3d ed], pp 19-4-19-5; Corporation of Presiding Bishop of Church of Latter-Day Saints v City of Porterville, 90 Cal App 2d 656, app dsmd 338 US 805, rehearing den 338 US 939; Minney v City of Azusa, 164 Cal App 12; West Hartford Methodist Church v Zoning Bd. of Appeals, 143 Conn 263; Milwaukie Co. of Jehovah’s Witnesses *293 v Mullen, 214 Ore 281; St. James Temple of A. O. H Church of God v Board of Appeals, 100 Ill App 2d 302, cert den 395 US 946; Miami Beach United Lutheran Church v City of Miami Beach, 82 So 2d 880 [Fla]).
The issue here is not the validity of a zoning ordinance which totally excludes churches and synagogues from a residential district, or even the validity of the present regulatory ordinance in all circumstances. Rather the question is the validity of the 100-foot sideline setback restriction of this ordinance as applied specifically to respondent synagogue.
There is obvious merit to the proposition that churches, synagogues and other institutions dedicated to religious objectives in consequence of their high purpose and moral worth make a unique contribution to the public welfare. But that is not all of it. They also bring congestion; they generate traffic and create parking problems; they can cause a deterioration of property values in a residential zone; in consequence of customary exemption from taxation they work an economic disadvantage to taxable properties (perhaps recognized as increasingly less acceptable today when the percentage of actual use of large and impressive institutional facilities is often very low indeed).
Turning to the case before us, we recognize that churches and synagogues occupy a special position along our scale of societal values and we do not suggest that their status should be leveled to that of all other users of property. We cannot agree, however, that the result in which the majority here acquiesces commends itself either to sound legal doctrine or to common sense.
First, as to the more strictly legal aspects of the matter we find encouragement in the writings if not the actual decisions of several reported cases (Matter of New York Inst. of Technology v Le Boutillier, 33 NY2d 125, 131; Matter of Westchester Reform Temple v Brown, 22 NY2d 488, 494; Ginsberg v Yeshiva of Far Rockaway, 45 AD2d 334, 337-338, affd 36 NY2d 706; Matter of Westchester Reform Temple v Griffin, 52 Misc 2d 726, affd 29 AD2d 672, 728-729, affd 22 NY2d 488, 496; St. James Temple of A. O. H. Church of God v Board of Appeals, 100 Ill App 2d 302, cert den 395 US 946; Board of Zoning Appeals v Decatur, Indiana Co. of Jehovah’s Witnesses, 233 Ind 83; and see Churches and Zoning, 70 Harv L Rev 1428). We do not perceive that the constitutional guaranties of freedom of worship are always absolute and invariable. *294 It even appears that in the past judicial attention has been preoccupied with the status and characteristics of the religious users rather than addressed to the functional aspects of the religious uses. Thus, today the facilities of religious institutions are properly and fittingly made available for use by other religious and community organizations and groups. Indeed this congregation until now has itself been the beneficiary of that practice. To this extent, the uses to which the buildings of religious institutions are put, from the standpoint of the protection of the public welfare, are no different from those of other places of community assembly and activity. As the Supreme Court of Florida has observed: "It is commonly known that generally the activities of the present-day churches are wide and varied as, indeed, they should be. The use of church buildings and facilities is not confined to worship periods on Sunday and mid-weekly prayer meetings. They are often used as places of instruction and entertainment. We do not frown upon these activities; on the contrary we think they should be promoted and encouraged. But we do not agree that because of the merits of these activities it can be said that an infringement of the constitutional rights of the owner results if it is not allowed use of the property for such purposes in the midst of a section of the city which has been restricted, and which the appellee in this instance knew had been restricted, primarily to homes to be occupied by individual families.” (Miami Beach United Lutheran Church v City of Miami Beach, 82 So 2d 880, 882 [Fla], supra.) It cannot be successfully contended, other than in an absolutist perspective, that the application of sensitively, minimally designed regulation of religious and educational uses would materially adversely affect the full and free exercise of religious or educational freedom.
We turn then to the factual aspects of the application of the particular regulation to which it is sought to subject this respondent. At the outset we note that this synagogue is not a long-term or even a short-term member of the Roslyn Harbor community. It is a newcomer which purchased the property in question with full awareness of the regulatory provisions of the local zoning ordinance which had predated the synagogue’s interest in the property by 20 years. Beyond that this synagogue comes not to serve the religious or other needs of residents of Roslyn Harbor but of members of its own congregation from nearby municipalities. Thus only 4 of the 125 *295 member families live in the Village of Roslyn Harbor; 55 families live outside the village limits in the densely populated Roslyn area south of Northern Boulevard; 27 families live miles away in the Great Neck area; and 26 families live in scattered other places on the North Shore. There is no evidence in the record before us that respondent synagogue could not have found an appropriate available location elsewhere in the Village of Roslyn Harbor or in one of the adjoining municipalities. It does not appear that an appropriate synagogue facility could not be constructed on the 2.4-acre parcel with full observance of the prescribed 100-foot sideline setbacks. It is true that respondent synagogue could not use the buildings presently located on the property and that new construction would be expensive—but all this was well known to it when the recently organized synagogue purchased the premises.
Given the reasonable expectation that use of the premises on Glenwood Road for synagogue purposes will surely increase vehicular traffic in the area and create parking problems, not only endangering the comfort and convenience of residents of the community but also creating hazards to public health and safety, we cannot conclude that there are constitutional or other legal considerations which preclude the application of what to us are the reasonable provisions of this zoning ordinance to this property owner in the circumstances presented in this record. Rather we would conclude that there is a reasonable relationship between the zoning regulation as sought to be applied here and the public health, safety and general welfare of the Village of Roslyn Harbor, and that the application of such regulation would not infringe the legitimate interests of respondent synagogue. The time has come when our court should forthrightly face the legal, economic and social implications of continued slavish adherence to the outmoded doctrine that churches and synagogues are wholly immune from even reasonable zoning regulation.
We would reverse the order of the Appellate Division and remit the case to Supreme Court, Nassau County, for entry of judgment declaring sections 11-2.14 and 11-2.30 constitutional as applied to respondent synagogue.
Judges Gabrielli and Cooke concur with Judge Fuchsberg; Chief Judge Breitel concurs in result in a separate opinion in which Judge Wachtler concurs; Judge Jones dissents and *296 votes to reverse in another separate opinion in which Judge Jasen concurs.
Order affirmed, with costs.