Conway, Ch. J.
 

 Petitioner, the Community Synagogue, obtained a deed to the premises herein involved on February 4, 1955 and in the following month applied to the board of appeals of the Village of Sands Point (hereinafter referred to as the Village) for a change of use permit from that of a óne-family dwelling in a Residence A District to that of a church for public Avorship and other strictly religious uses, and for certain variances, pursuant to subdivision 4-b of section 602 of the zoning ordinance of the Village. Hearings were held on May 10, July 26 and August 30, 1955. At the August 30th hearing, petitioner, pursuant to prior notice, requested leave to withdraw that part of its application which sought anything other than the issuance of a use permit which would allow petitioner to use the premises for. a church for public worship and other strictly religious uses. This requested amendment of the application was granted.
 

 The petitioner called six Avitnesses to testify on its behalf at the hearing before the board, and the Village of Sands Point called one —the village building inspector. There was no objection by any resident of Sands Point or, indeed, by anyone except the village board of trustees of the Village of Sands Point.
 

 Petitioner’s witnesses testified in substance as folloAvs: that the aim-of petitioner was to establish a permanent place for religious worship, religious teaching and training,, fellowship, guidance of indoor and outdoor activities for youth and community Avork; that there were approximately 200 families in the congregation; that the nearest other reformed synagogue was 12 miles away; that the Friday night services conducted at temporary quarters had not had more than 80 people in attendance and that there had been about 10 to 20 automobiles which had brought them; that there would be a maximum of 100
 
 *449
 
 children who would attend Sunday School; that there would be a men’s club, a sisterhood (women’s social group) and youth activities in connection with the synagogue; that a contract had been entered into to have the principal building, on the premises purchased, conform to the fire laws; that the building was fireproof with steel beams and concrete arches; that it had had a fire detection and fire-fighting equipment installed; that the floors were all concrete; that the main staircase was fireproof and that the other stairways were of steel construction; that the sanitary facilities would accommodate a congregation of 200 people at any one time; that the building was eminently suited for a place of worship and could be made to conform to the State Building Code with slight possible changes; that the roads which were presently on the property would accommodate 125 parked cars without hindering or interfering with traffic; that the ground area ratio of the buildings to the 24 acres contained in the parcel was approximately 3%; that the property could not feasibly be used as a one-family dwelling nor could it feasibly be broken down into two-acre plots; that there were no churches in Sands Point and that the establishment of a religious institution on the property would not tend to depreciate the value of the property in the area, but, in fact, might tend to appreciate it. In addition one of petitioner’s witnesses testified to the uses to which the premises had been put since the death of the owner-builder in 1941, and they included the following: French sailors used the property as a place of recreation for a period of about six months, during which time 60 to 80 sailors lived there and had social gatherings to which they invited a considerable number of persons; that from the end of 1943 until 1946 the United States Merchant Marine used the property as a rehabilitation and rest center, during which period there were in excess of 100 residents; that from 1946 until 1955 the United States Navy used the premises as an officer’s club, and although there were never more than 70 residents there at a time, there were frequent social gatherings at which there were at times 300 to 400 people.
 

 The Village of Sands Point had only one witness testify and that Avas the building inspector of the village. He testified that in order to determine whether the building conformed to the State Building Code he would need complete specifications. On cross-examination it was brought out that the witness had spent
 
 *450
 
 only two and one-half hours on the premises; that he ascertained that the fire laws affecting the proposed use had not been complied with, and that he did not ascertain any other violations since he said “ I didn’t go over it that carefully.”
 

 During the course of the hearings the petitioner submitted exhibits other than the architect’s plans. Exhibit F is a letter from an assistant fire marshall in which he set forth the changes which would be required to be made to have the building comply with the fire laws in view of its proposed use as a synagogue and school. Exhibit H is a contract, entered into by petitioner, to make all the necessary changes set forth in the fire marshall’s letter. The other exhibits are not important for our consideration of the matter before us.
 

 On September 6, 1955 the board denied the petitioner’s amended application and made findings. The Appellate Division confirmed the determination of the board.
 

 Article II-A (§ 251, subd. 3), relating to Residence A Districts, provides:
 

 “ No building may be erected, altered or used, and no lot or premises may be used except for the following purposes:
 

 # # #
 

 ‘ ‘ 3. Churches for public worship and other strictly religious uses
 
 and
 
 in accordance with the discipline, rules and usages of the religious corporation which will own, support and maintain such church and the ecclesiastical governing body, if any, to which such corporation is subject * * * providing any such use and accessory use has been approved by the Board of Appeals after public notice and hearing and after taking into consideration the public health, safety and general welfare in accordance with the provisions of Article VI, Section 602, Subdivision 7, hereof and subject to appropriate conditions and safeguards prescribed by said board.” (Emphasis supplied.)
 

 Subdivision 3 of section 251 of article II-A was adopted January
 
 24,
 
 1955 and on the same day there was added to subdivision 7 of section 602 of article VI seven further subdivisions. Article VI (§ 602, subd. 7, sub-subd. 7) provides as follows:
 

 “
 
 7. Accessory uses. Accessory uses shall be of the same ■ character and nature as the use to which the same is accessory.
 

 “ The Board of Appeals
 
 may,
 
 in appropriate cases, require
 
 as a condition of any permit issued
 
 under this section, for the
 
 *451
 
 purpose of establishing reasonable safeguards for the safety, health and welfare of the occupants and users of buildings and their accessory structures, that the applicant and the buildings and their accessory structures on the premises shall comply with the provisions of the proposed ‘ Greneral Building Construction Code ’, dated July 3, 1955 [sic] prepared by the State Building Code Commission, filed in the office of the Clerk of the Village of Sands Point on February 15, 1955, and may require that the premises, the subject of the application, shall not be used for the purposes permitted by the Board of Appeals except upon the issuance by the Building Inspector of a
 
 certificate of occupancy
 
 certifying that the terms and conditions of the permit have been complied with.” (Emphasis supplied.)
 

 When a zoning board, or other administrative body, denies an application, the question presented for review is whether the board’s action was arbitrary, capricious, unauthorized or, as the cases phrase it, whether the petitioner has been illegally oppressed
 
 (Matter of Reed
 
 v.
 
 Board of Standards & Appeals,
 
 255 N. Y. 126).
 

 Whether the use proposed by petitioner under its application as amended, is permitted in terms by the zoning ordinance would appear to present a question of law rather than one of fact since it involves an interpretation of subdivision 3 of section 251 of article II-A and of subdivision 7 of section 602 of article VI, quoted
 
 (supra).
 

 The purpose of petitioner as alleged in paragraph 3 of the amended application is to use the premises as a “ church for public worship and other strictly religious uses and in accordance with the discipline, rules and usages of the religious corporation which owns, supports and maintains such church and of the ecclesiastical governing body to which such corporation is subject, together with a church or Sunday School to be conducted by the said religious corporation and in accordance with the following statement of principles ”. That is almost entirely in the words of the ordinance.
 

 The certificate of incorporation of petitioner states: “ The purposes for which it is organized are to establish a Congregation to perpetuate Judaism; to serve the Jewish people by providing a place where they may worship and where the teachings of Judaism may be made known; to advance the welfare of all those who may come under its influence and to
 
 *452
 
 promote Judaism in all relations of life by religious education, social welfare activities and such other means as shall serve to convey the teachings of Judaism.”
 

 True, the board of appeals in denying the petition of petitioner made 17 findings and we shall now consider them. The first 4 are mere factual recitals which have no bearing on the determination. The remaining findings may not be upheld for divers reasons:
 

 (1) As to Finding No. 12 — The board erred in holding that in its application the petitioner sought to use the premises for purposes other than a church for public worship and other strictly religious uses in view of the amendment to petitioner’s application granted by the board and referred to
 
 supra.
 

 (2) As to Finding No. 16 — What is or is not the duty of the board of appeals to determine is clearly a question of law and not one of fact.
 

 (3) As to Finding No. 17 — This finding was arbitrary and capricious for there is no. evidence to- support it in the record.
 

 (4) As to Findings Nos. 6, 7, 8, 9, 10, 11, 13, 14 and 15 — These findings contain the imposition of conditions which were in excess of the board’s authorization since they were not provided for in the zoning ordinance, the source of the board’s power, and
 

 (5) As to Finding No. 5 — This finding is based upon a procedural defect which must be deemed to have been waived since the board entertained the application on the merits.
 

 To repeat we are only concerned with the application of petitioner, as amended, with the result that the board was requested to ‘ ‘ pass upon the issuance of a use permit to use the property known as ‘ The Chimneys ’: As a church for public Arorship and other strictly religious uses * * * together with a church or Sunday School to be conducted by the said religious corporation and in accordance with the following statement of principles: ’ ’ The statement of principles recited that the synagogue is a house of prayer where the worship of Q-od is carried on in accord with the Jewish tradition; that the synagogue is a house of study wherein religious teachings for adults, as well as children, are carried on; that the synagogue is a place of fellowship and friendship among its adherents wherein there is present a men’s group, a sisterhood (women’s group), and a junior high school age youth group, and that the syna
 
 *453
 
 gogue is also a place where services for the community are performed, such as Bed Cross work, Boy Scout work and work of other such organizations.
 

 In Finding No. 12, the board determined that the requested use of the petitioner was for purposes other than a “ church for public worship and other strictly religious uses ”. We cannot agree. A church is more than merely an edifice affording people the opportunity to worship God. Strictly religious uses and activities are more than prayer and sacrifice and all churches recognize that the area of their responsibility is broader than leading the congregation in prayer. Churches have always developed social groups for adults and youth where the fellowship of the congregation is strengthened with the result that the parent church is strengthened. We find evidence of this in the Old Testament. When a member of the congregation cements friendships with other members of the congregation, the church benefits and becomes stronger. It is a religious activity for the church to provide a place for these social groups to meet, since the church by doing so is developing into a stronger and closer knit religious unit. To limit a church to being merely a house of prayer and sacrifice would, in a large degree, be depriving the church of the opportunity of enlarging, perpetuating and strengthening itself and the congregation. The ordinance under consideration recognizes this in its terms for it provides for the use of a building for the purpose: “ 3. Churches for public worship and other strictly religious uses
 
 and
 
 in accordance with the discipline, rules and usages of the religious corporation which will own, support and maintain ” it (emphasis supplied). Indeed prior to the entry by petitioner into a contract to purchase “ The Chimneys ”, all churches, under the then ordinance, were permitted as of right in a residential district without approval even of the board of appeals. It is true that the religious aim of strengthening the congregation through fellowship may not be permitted to be perverted into a justification for establishing a place of entertainment, such as a country club, but the facts clearly show that there is no such attempt here and each case ultimately rests upon its own facts.
 

 The board also found that: “ After consideration of the evidence before it, and inspection of the subject property and the
 
 *454
 
 neighborhood, and upon the personal knowledge and familiarity of the members of the Board * * * that the granting of this application * * * would be inconsistent with the character of the district * * *; would not conserve values * * *; would not promote health, safety, convenience and welfare; would not accomplish substantial justice; and would not be in harmony with the general purpose and intent of the said ordinance and the applicable provisions of the Village Law.” (Finding No. 17.)
 

 There is nothing in the record which supports those findings and if they are to be supported they must be supported on the basis of the board’s personal inspection and general familiarity with conditions presented. It is well-established law that a board may act upon its own knowledge of conditions and/or its own personal inspection, but the mere conclusory statement in the findings of its personal knowledge and inspection does no more than demonstrate or establish the basis for the board’s arrival at the factual findings. When the board does so act, it is incumbent upon it to set forth in its return the facts known to the members, but not otherwise disclosed
 
 (People ex rel. Fordham Manor Ref. Church
 
 v.
 
 Walsh,
 
 244 N. Y. 280, 287). In our present case, Finding No. 17 contains no factual findings but gives the basis for possible factual findings and then gives the conclusions, e.g., that the granting of the application would not promote health, safety, convenience and welfare. If we were to sustain such conclusory findings, the courts would thereby be deprived of their right to review a board’s action, for the courts would not be in a position to determine whether or not the actual factual findings were arbitrary, capricious or unauthorized, since they had not been stated. As our court has previously stated:
 

 “
 
 But the power of the Board to do justice informally and promptly is not limited to cases where witnesses have been heard. Without any witnesses at all, it may act of its own knowledge * * *. In that event, however, it must set forth in its return the facts known to its members, but not otherwise disclosed. To characterize the situation as a hardship without more does not tend in any substantial degree to enlighten a reviewing court. There must be disclosure of the facts from which hardship is inferred. * * *
 

 
 *455
 
 ‘ ‘ At the same time judicial review would be reduced to an empty form if the requirement were relaxed that in the return of the proceedings the hardship and its occasion must be exhibited fully and at large. * * # Disclosure is the antidote to partiality and favor.”
 
 (People ex rel. Fordham Manor Ref. Church
 
 v.
 
 Walsh,
 
 244 N. Y. 280, 287, 290-291,
 
 supra.)
 
 As a result, in the absence of any evidence in the record of facts within the knowledge of the board, Finding No. 17 may not be sustained and must be deemed to be arbitrary.
 

 The majority of the findings of the board (6, 7, 8, 9, 10, 11, 13, 14 and 15) must also fall for in those the board attempted to impose standards, requirements or conditions which were not set forth in the ordinance
 
 (Matter of Small
 
 v.
 
 Moss,
 
 279 N. Y. 288). It is the board’s contention that it can require petitioner to submit plans and specifications, as a condition precedent to obtaining a change of use permit, which would demonstrate that the use of the premises proposed by petitioner would conform to the Non-Residence Building Code of the Village (hereinafter referred to as the Building Code) in the following respects: as to the materials of which the building is constructed, structural loads, lighting, plumbing and heating systems, ventilation, fire protection, etc. (Finding No. 6): as to the main dwelling being capable of being used as a place of public assembly (Finding No. 7). The board asserts that without the submission of such detailed plans and specifications, the board cannot determine whether the proposed use as a place of public assembly would create a hazard, either to health, safety, morals or general welfare (Finding No. 8), or from fire, panic and other causes (Finding No. 9), or whether there would be adequate light and air (Finding No. 10), or whether the sanitary facilities conform to the Building Code (Finding No. 11). The Building Code of the Village is in fact the “ General Building Construction Code * * * prepared by the State Building Code Commission and filed in the office of the Clerk of the Village on February 15, 1955, and adopted as the Non-Residence Building Code of the Village on March 15,1955 ”, subsequent to petitioner’s purchase. The findings indicated are predicated upon the implied assertion that the petitioner must now file plans and specifications showing compliance with or the possible compliance with such Building Code. The zoning ordi
 
 *456
 
 nance does not empower the hoard to impose such a condition precedent to the issuance of a change of use permit, for the ordinance provides that: “ The Board of Appeals
 
 may,
 
 in appropriate cases, require
 
 as a condition of cmy permit issued,
 
 under this section, for the purpose of establishing reasonable safeguards * * * that the applicant and the buildings and their accessory structures on the premises shall comply with the provisions of the proposed ‘ General Building Construction Code ’, dated July 3, 1955 [sic] prepared by the State Building Code Commission, filed in the office of the Clerk of the Village of Sands Point on February 15, 1955, and may require that the premises, the subject of the application, shall not be used for the purposes permitted by the Board of Appeals except upon the issuance by the Building Inspector of a
 
 certificate of occupancy
 
 certifying that the terms and conditions of the permit have been complied with.” (Zoning Ordinance, art. VI, § 602, subd. 7, referred to in art. II-A, § 251, subd. 3, supra; emphasis supplied.)
 

 This section manifestly sets forth that the board “may * * * as a
 
 condition of any permit issued
 
 ” require conformance with the Building Code, and require that the premises may not be used “ for the purposes permitted by the Board of Appeals except upon the issuance * * * of a certificate of occupancy certifying that the terms and conditions of the permit have been complied with.” In other words, upon the granting of a use permit to petitioner the board of appeals may attach conditions as indicated in subdivision 7 together with a further condition that a certificate of occupancy be obtained from the building inspector “ certifying that the terms and conditions of the permit have been complied with.” We have not referred to subdivision 4-b of section 602,- since that was intended to apply to a variance and no variance is sought here, although the result would be the same since the conditions to be complied with would be attached to the use “ permit issued.” A petitioner with a use permit granted may safely make expenditures to meet conditions, known in advance, leading to the issuance of a certificate of occupancy. In fact, the only plan which seems to be required of petitioner in order to obtain a change of use was a site plan showing the approximate location and uses of the existing main building and site generally. In addition, the evidence presented by the petitioner, and the
 
 *457
 
 complete absence of any evidence to the contrary, showed that the premises were suitable as a place of public assembly, and would not create either a hazard to health, safety, morals or general welfare or a hazard from fire and panic, and that there was more than suEcient light and air to satisfy the requirement of the zoning ordinance.
 

 The board also imposed upon petitioner the ultimate burden of proposing proper parking space leaving it as the duty of the board only to approve or disapprove (Finding No. 13). This, too, is not authorized by the zoning ordinance. Subdivision 7 of section 602 does provide that petitioner must file a site plan setting forth the approximate location of proposed parking areas, but the same subdivision also provides that “ The size and location of parking and recreation areas shall be determined by the Board of Appeals * * V’ (Zoning Ordinance, § 602, subd. 7, par. [4].) It is the duty of petitioner only to suggest and indicate a possible parking area while it remains the duty of the board to actually determine where the parking area should be located and what size it should be. The petitioner did present to the board suggested parking areas, and the board attempted either to ignore its duty or to shift the duty of final determination of such areas to the petitioner, and upon doing so disapproved of the areas proposed by petitioner and made no determination of its own.
 

 In Finding No. 14, the board attempted to impose upon petitioner the burden of showing that there was no other site available which was smaller than the one proposed and yet suitable for petitioner’s purpose, and in Finding No. 15 found that the subject premises were too large for the proposed use. Neither finding may be sustained for neither has any basis in the zoning ordinance, and they seek, in essence, to impose a nonexistent duty on petitioner requiring it to justify the size of the site proposed in relation to the proposed use. The restrictions which are present in- the ordinance with reference to the size of premises are only with respect to minimum requirements and, as we have seen, the area of the buildings is but 3% of the area of the site.
 

 The remaining finding (Finding No. 5) states that the application of petitioner does not comply with the rules of procedure adopted August 31, 1954 in that it was not accompanied by the necessary diagrams which were needed. This finding, although
 
 *458
 
 apparently embodying the false premise of the necessity of detailed specifications, prior to the granting of a use permit, is procedural in nature, and must be deemed to have been waived by the consideration of the application on the merits.
 

 It should be borne in mind that the hearings on the application of petitioner were public ones after the publication of notice through official newspaper advertisement. No resident or other individual appeared in opposition to the granting of the application. The sole objection came from the village board of trustees of the Incorporated Village of Sands Point which was permitted to intervene by order entered October 4, 1955.
 

 The position of the Village, as stated clearly in its brief (pp. 12-14) is that the board of appeals, under the provisions of the ordinance here, should have the power to deny an application for the location of a church at a “ precise spot ”. This would not, of course,
 
 prohibit
 
 the use, erection, alteration or improvement of buildings or structures for churches and synagogues, in municipalities such as the intervenor, but would
 
 limit
 
 it. While many may be tempted to think that the solution offered by the intervenor is excellent, when one thinks it through one realizes that, if the municipality has the unfettered power to say that the ‘ ‘ precise spot ’ ’ selected is not the right one, the municipality has the power to say eventually which
 
 is
 
 the proper
 
 “
 
 precise spot ”. That, we all can see is the wrong solution. The men and women who left Scrooby for Leyden and eventually came to Plymouth in order to worship God where they wished and in their own way must have thought they had terminated the interference of public authorities with free and unhandicapped exercise of religion. We think that we should accept the fact that we are the successors of
 
 “
 
 We, the people ” of the Preamble to the United States Constitution and that a court may not permit a municipal ordinance to be so construed that it would appear in any manner to interfere with the ‘ ‘ free exercise and enjoyment of religious profession and worship ”. (N. Y. Const., art. I, § 3.)
 

 The order of the Appellate Division should be reversed and the matter remitted to the board of appeals for the purpose of the issuance of the use permit upon such proper administrative conditions as the board deems reasonable and necessary, with costs in this court and the Appellate Division as against the Village of Sands Point, the intervenor-respondent, only.
 

 
 *459
 
 Desmond, Dye, Fuld, Froessel and Burke, JJ., concur with Conway, Ch. J.; Van Voorhis, J., dissents and votes to affirm for essentially similar reasons to those expressed in his dissenting opinion in
 
 Matter of Diocese of Rochester
 
 v.
 
 Planning Bd. of Town of Brighton
 
 (1 N Y 2d 508, decided herewith).
 

 Order of Appellate Division reversed, with costs in this court and in the Appellate Division against the intervenor-respondent, and the matter remitted to the board of appeals for further proceedings in accordance with the opinion herein.