38 N.Y.2d 283 (1975)
Jewish Reconstructionist Synagogue of the North Shore, Inc., Respondent,
v.
Incorporated Village of Roslyn Harbor et al., Appellants.
Court of Appeals of the State of New York.
Argued October 14, 1975.
Decided December 4, 1975.
George C. Pratt and Samuel S. Tripp for Village of Roslyn Harbor, appellant.
John M. Farrell, Jr., and C. Ellis Schiffmacher for respondent.
Judges GABRIELLI and COOKE concur with Judge FUCHSBERG; Chief Judge BREITEL concurs in result in a separate opinion in which Judge WACHTLER concurs; Judge JONES dissents and votes to reverse in another separate opinion in which Judge JASEN concurs.
*285 FUCHSBERG, J.
We are here confronted with the question of whether a village may by zoning ordinance establish fixed setback requirements applicable to religious institutional uses in an area zoned for residences. If such an invariable requirement is not permissible, then we must also decide whether, on the facts of this particular case, the setback requirement is sufficiently reasonable so that it may be applied to deny this plaintiff a variance. Finally, we are also required to decide whether the ordinances which set forth the bases upon which the requested special use permit is to be granted or denied are valid, since the village has indicated that, under these guidelines, it intends to deny the special use permit even if the setback variance is resolved in favor of the synagogue.
The plaintiff is a religious corporation with only approximately 125 family memberships (yielding approximately 300 to 350 individual members, including spouses and children). Organized about eight years before the institution of this litigation, it conducts religious services, maintains a youth program, provides education classes, and conducts various other religious and educational adult programs. During its first years of existence, it used the church buildings of other denominations for its services and programs. It is conceded that its membership is spread over a fairly wide area surrounding the Village of Roslyn Harbor, and that only 4% of *286 its family members actually live in the respondent village itself.
In 1970, plaintiff purchased two adjacent lots in the Village of Roslyn Harbor, together with the buildings thereon. These lots had been part of a large estate which was subdivided into some six or seven residential lots in 1954; four of these are now owned by residents who protest the location of the synagogue so near to their homes. The synagogue seeks to use the former estate house as its meeting place for services and programs and the former guest house as a residence for its Rabbi. The estate house is located some 29 feet from the property line; a zoning ordinance of the village requires that all religious uses located in residential areas be set back at least 100 feet. Although the village granted to its zoning board the power to consider, on various grounds, the suitability of a religious use in the planned location, the board is not given the authority to vary the 100-foot setback requirement.
Accordingly, when the synagogue applied for a special use permit and for the requisite variance, the variance was denied and, as a consequence, the permit was also denied. The board also indicated that, had not the denial of the variance settled the matter, it would have denied the special permit because of the synagogue's potential effect on traffic and because there was insufficient water pressure in nearby fire hydrants.
The synagogue brought a proceeding under CPLR article 78 to compel the board to grant the requested variance. On appeal to this court, we held that the courts could not compel the board to grant that which it had no power to grant and suggested that a declaratory judgment action would be the appropriate form in which to test the question raised. (34 N.Y.2d 827.) The present appeal is from that declaratory judgment action, the courts below having found that the ordinances in question are unconstitutional.
The judgment should be affirmed. In setting forth our reasons, we indicate, first, the framework within which the issues before us must be decided.
There have been three major cases involving zoning restrictions applied detrimentally to religious institutions in this State. In the first of these Matter of Community Synagogue v Bates (1 N.Y.2d 445), we held, inter alia, that churches and other religious institutions are beneficial to the public welfare by their very nature and that, therefore, exercises of the police power directed toward determining whether such institutions *287 will harm the public if located in a particular residential area must begin with that assumption. In particular, we forbade localities to bar religious uses on the ground that they had not met a burden of proof that other suitable locations could not be found. While the decision was made in the context of review of an administrative determination under a particular ordinance, its language is not limited to the confines of that ordinance or to the procedural posture involved. The special status of religious institutions under the First Amendment freedom of religion is clearly the dominant factor.
In a companion case, Matter of Diocese of Rochester v Planning Bd. (1 N.Y.2d 508), we reaffirmed those propositions. We added that the sort of considerations which may figure in a decision to grant or deny a special use permit to other entities, such as commercial ones, may not play the same role in decisions affecting religious uses. Specifically, we held that this was true regardless of whether property values will be affected adversely and whether the local tax base might suffer from the loss of revenue such religious uses entail. In the Rochester case, these reasons had been advanced by the town as sufficient to deny the special use permit; no effort to find some accommodation between the needs of the residents and those of the church had been attempted.
It has been forcefully argued to us in the case at bar that there is growing support for the view that churches ought to be subject to the same zoning considerations which are permitted to govern applications from other entities. We are aware that much of the support for the desirability of churches in residential areas descends to us from older case law: "The traditional concept of a small church serving the immediately neighboring community undoubtedly had something to do with the idea that such use was an integral part of community life in `the best and most open localities.' However the establishment of a modern church, not dependent upon local residents as its communicants, and in some instances attracting people from far distances, the inevitable use of the automobile in connection therewith and the increased activities of the church for social and community functions having only a remote connection with its primary function, all present a different picture." (1 Rathkopf, Law of Zoning and Planning [3d ed], p 19-8.)
This description no doubt portrays accurately the problems *288 presented by religious uses in residential areas today. Nevertheless, it portrays but one half of the necessary equation. Religion and State, separate and coexisting, do make demands on one another, and the distinctions between the little church around the corner and the modern religious center must, no doubt, be acknowledged and accommodated. But the peculiarly pre-eminent status of religious institutions under the First Amendment provision for free exercise of religion remains an important factor entering into the balance that also weighs the needs or desires of the community.
Indeed the ground rules for such a balance were set forth in Matter of Westchester Reform Temple v Brown (22 N.Y.2d 488). There, in discussing the problems involved in honoring the constitutionally protected rights of religious institutions while acknowledging the fact that they do bring traffic in their wake, do impinge on the quiet enjoyment of their immediate neighbors, and do affect the tax base of a town, we held (pp 496-497): "We have not said that considerations of the surrounding area and potential traffic hazards are unrelated to the public health, safety or welfare when religious structures are involved. We have simply said that they are outweighed by the constitutional prohibition against the abridgment of the free exercise of religion and by the public benefit and welfare which is itself an attribute of religious worship in a community. If the community can, consistent with this policy, both comply with the constitutional requirement and, at the same time, avoid or minimize, insofar as practicable, traffic hazards or other potential detriments bearing a substantial relation to the health, safety and welfare of the community, there is no barrier to its doing so. Nevertheless, we have already decided in the Rochester case that, where an irreconcilable conflict exists between the right to erect a religious structure and the potential hazards of traffic or diminution in value, the latter must yield to the former."
Thus the question before us now is whether the ordinances of the Village of Roslyn Harbor contain guidelines which promote such a permissible kind of compromise or whether, either on their faces or as applied, they restrict religious uses without recognizing their special, protected status under the First Amendment. So phrased, the question is clearly the same one which must always be asked when the exercise of the police power conflicts with the exercise of a First Amendment right. (See People v Taub, 37 N.Y.2d 530; Cantwell v Connecticut, 310 US 296; *289 Sherbert v Verner, 374 US 398; Wisconsin v Yoder, 406 US 205.)
Unlike the ordinances which we upheld in the Westchester case,[1] which required the authorities to consider the effects of a religious use upon residents and to set building size and lot restrictions to avoid or minimize "insofar as practicable" any detrimental effects (22 NY2d, 495), the special use ordinance before us directs authorities to deny the use permit if they find that the religious use will have any detrimental effect on public safety, health, or welfare, including effects on traffic, on fire safety, and on the character of the surrounding neighborhood. It contains no substantial requirement that efforts to accommodate or mitigate these effects be made. (See Anderson, New York Zoning Law and Practice [2d ed], §§ 9.29-9.34.)
The variance ordinance falls to the same analysis. While residents may apply for variances from setback requirements and the board may grant them, religious uses are subjected to an invariable requirement of 100 feet. We need not address the potential violation of equal protection which may be involved in such a differentiation; indeed there may be none, for it can be argued that churches and synagogues do present sufficiently different problems so that they may be treated separately from residences without offending that clause of the Constitution. (See 2 Anderson, American Law of Zoning, §§ 9.19-9.25.) Rather, the invariability of the ordinance offends against the requirement that efforts to accommodate religious uses be made. There could well be situations in which no detriment to any aspect of public safety or welfare would result from a setback of less than 100 feet.[2]
Nor is invariability the only evil in the ordinance. Its application to the synagogue in this case is not supported by sufficient evidence to justify it. While there is, in the record, only some indication that there may be traffic or noise-related *290 inconvenience to the synagogue's immediate neighbors, or problems with fire protection, there is no hard evidence to that effect, nor that any effort was made to find ways to mitigate these inconveniences short of outright denial of the variance. While this no doubt stems from its intransigent nature, which denied the board power to modify it for any reason, that does not mean we must simply remit this case for further findings as to what setback, if any, is a reasonable one. As already indicated, the existing building which the synagogue wishes to use already sits, as it has for a long time, some 29 feet from the property line. Given this record, the question which the village must answer is not whether 29 feet is reasonable, but rather, what reasonable measures can be taken to mitigate the effect upon the neighbors of having a synagogue 29 feet from the property line.[3]
The record makes clear that the village's objections to the location chosen by the synagogue are founded on no more than perceived inconveniences. The village's own ordinances reflect a policy which labels acceptable a distance of 125 feet between a religious building and the nearest residence, since these ordinances permit a residence to be located 25 feet from its property line and would permit a church to be located 100 feet from its property line. The record discloses, that, in fact, the nearest house is 106 feet away from the synagogue building. Requiring the synagogue to observe the 100-foot setback in these circumstances would place it some 177 feet away from the nearest house or, put another way, the village's determination to exclude the synagogue is based on a mere 19-foot discrepancy between reality and the village's own statutory ideal. Since the cost to the synagogue of moving the building or constructing new facilities in its place is greater than it can afford, such a requirement would be tantamount to a denial of the use permit.
There remains the assertion made by the village that, since so few of its members live in the Village of Roslyn Harbor, the synagogue should be subject to a requirement that it demonstrate that there is no more suitable place for it elsewhere. We disposed of that contention in Matter of Community Synagogue v Bates, 1 N.Y.2d 445, (supra). *291 As a variation on this theme, however, the village argues that if it, rather than the synagogue, can show the inappropriateness of location, then it may exclude a religious use, citing to our decision in Matter of Diocese of Rochester v Planning Bd. (1 N.Y.2d 508, supra). We did indicate, in that case, that it might be possible for a town to exclude religious uses where all other exceptions to the residential character of the area are also excluded.[4] But we did not say this could be done for no better reason than that a number of the members of the church do not live in the town. As Mr. Justice MEADE correctly noted in his decision below, the status of religious uses as protected under the First Amendment is the source of their desirability in the community; such First Amendment rights have never, to our knowledge, been limited to being exercised within the boundaries of one's own place of residence. Moreover, as we noted in Community Synagogue, the power to decide where churches may not locate becomes the power to say where they may do so. That is impermissible.
In sum, to the extent that the ordinances of the Village of Roslyn Harbor authorize the denial of a special use permit for location of religious institutions in a residential district without setting reasonable requirements for adaptations which would mitigate their effects, the ordinances are unconstitutional. Accordingly, the order below must be affirmed in all respects.
Chief Judge BREITEL (concurring).
I concur in result to affirm. I agree with so much of the dissent as characterizes the majority expression of the law as too absolutist in providing a preference and even to some extent an immunity from significant zoning regulation for premises devoted to religious uses. On the other hand, I cannot agree with the dissent that significant factors in the treatment of religious premises should be the service of members of its congregation in the community, that its presence may lessen property value, or that a religious group may be required to choose among alternatives less offensive to the chosen milieu.
Fundamentally, the law should move in the direction of requiring even religious institutions to accommodate to factors directly relevant to public health, safety, or welfare, inclusive *292 of fire and similar emergency risks, and traffic conditions insofar as they involve public safety (cf. Matter of Diocese of Rochester v Planning Bd., 1 N.Y.2d 508, 526; see, generally, 1 Rathkopf, Law of Zoning and Planning [3d ed], p 19-17). Indeed, even in Matter of Westchester Reform Temple v Brown (22 N.Y.2d 488, 496), while stating that these considerations could not outweigh the constitutionally-based ruling favoring religious institutions, the court recognized that "considerations which may wholly justify the exclusion of commercial structures from residential areas * * * [may] * * * be considered for the purpose of minimizing, insofar as practicable, the impairment of surrounding areas or the danger of traffic hazards". It is the all but conclusive presumption that considerations of public health, safety and welfare are always outweighed, as some of the precedents suggest, by the policy favoring religious structures that I find objectionable. Hence, my rejection of the absolutist view expressed in the majority opinion, although to be sure there is the broad language in the precedents which might support that view.
I vote to affirm, since on this record, and considering the several grounds for preventing the village board of appeals from granting plaintiff a special permit, it is likely that the effect, if not the purpose, of the ordinance is exclusionary, without compensating values to sustain a public purpose related to public safety and public welfare. The overall impact of the restrictions in the ordinance as it now reads does not accommodate sufficiently to the priorities, albeit limited, that should be accorded to religious institutions.
JONES, J. (dissenting).
We think the time has come and that this is an appropriate case in which to breathe vitality into the so far lifeless words of Judge FROESSEL that, notwithstanding that churches, with schools, enjoy a favored status in the law of zoning, nonetheless, they can be held subject to "appropriate restrictions" (Matter of Diocese of Rochester v Planning Bd., 1 N.Y.2d 508, 526). In our view New York should approach the position taken by the growing number of States holding what has been termed the "minority view" (1 Rathkopf, Law of Zoning and Planning [3d ed], pp XX-X-XX-X; Corporation of Presiding Bishop of Church of Latter-Day Saints v City of Porterville, 90 Cal App 2d 656, app dsmd 338 US 805, rehearing den 338 US 939; Minney v City of Azusa, 164 Cal App 12; West Hartford Methodist Church v Zoning Bd. of Appeals, 143 Conn 263; Milwaukie Co. of Jehovah's Witnesses v Mullen, 214 Ore 281; *293 St. James Temple of A. O. H. Church of God v Board of Appeals, 100 Ill App 2d 302, cert den 395 US 946; Miami Beach United Lutheran Church v City of Miami Beach, 82 So 2d 880 [Fla]).
The issue here is not the validity of a zoning ordinance which totally excludes churches and synagogues from a residential district, or even the validity of the present regulatory ordinance in all circumstances. Rather the question is the validity of the 100-foot sideline setback restriction of this ordinance as applied specifically to respondent synagogue.
There is obvious merit to the proposition that churches, synagogues and other institutions dedicated to religious objectives in consequence of their high purpose and moral worth make a unique contribution to the public welfare. But that is not all of it. They also bring congestion; they generate traffic and create parking problems; they can cause a deterioration of property values in a residential zone; in consequence of customary exemption from taxation they work an economic disadvantage to taxable properties (perhaps recognized as increasingly less acceptable today when the percentage of actual use of large and impressive institutional facilities is often very low indeed).
Turning to the case before us, we recognize that churches and synagogues occupy a special position along our scale of societal values and we do not suggest that their status should be leveled to that of all other users of property. We cannot agree, however, that the result in which the majority here acquiesces commends itself either to sound legal doctrine or to common sense.
First, as to the more strictly legal aspects of the matter we find encouragement in the writings if not the actual decisions of several reported cases (Matter of New York Inst. of Technology v Le Boutillier, 33 N.Y.2d 125, 131; Matter of Westchester Reform Temple v Brown, 22 N.Y.2d 488, 494; Ginsberg v Yeshiva of Far Rockaway, 45 AD2d 334, 337-338, affd 36 N.Y.2d 706; Matter of Westchester Reform Temple v Griffin, 52 Misc 2d 726, affd 29 AD2d 672, 728-729, affd 22 N.Y.2d 488, 496; St. James Temple of A. O. H. Church of God v Board of Appeals, 100 Ill App 2d 302, cert den 395 US 946; Board of Zoning Appeals v Decatur, Indiana Co. of Jehovah's Witnesses, 233 Ind 83; and see Churches and Zoning, 70 Harv L Rev 1428). We do not perceive that the constitutional guaranties of freedom of worship are always absolute and invariable. *294 It even appears that in the past judicial attention has been preoccupied with the status and characteristics of the religious users rather than addressed to the functional aspects of the religious uses. Thus, today the facilities of religious institutions are properly and fittingly made available for use by other religious and community organizations and groups. Indeed this congregation until now has itself been the beneficiary of that practice. To this extent, the uses to which the buildings of religious institutions are put, from the standpoint of the protection of the public welfare, are no different from those of other places of community assembly and activity. As the Supreme Court of Florida has observed: "It is commonly known that generally the activities of the present-day churches are wide and varied as, indeed, they should be. The use of church buildings and facilities is not confined to worship periods on Sunday and mid-weekly prayer meetings. They are often used as places of instruction and entertainment. We do not frown upon these activities; on the contrary we think they should be promoted and encouraged. But we do not agree that because of the merits of these activities it can be said that an infringement of the constitutional rights of the owner results if it is not allowed use of the property for such purposes in the midst of a section of the city which has been restricted, and which the appellee in this instance knew had been restricted, primarily to homes to be occupied by individual families." (Miami Beach United Lutheran Church v City of Miami Beach, 82 So 2d 880, 882 [Fla], supra.) It cannot be successfully contended, other than in an absolutist perspective, that the application of sensitively, minimally designed regulation of religious and educational uses would materially adversely affect the full and free exercise of religious or educational freedom.
We turn then to the factual aspects of the application of the particular regulation to which it is sought to subject this respondent. At the outset we note that this synagogue is not a long-term or even a short-term member of the Roslyn Harbor community. It is a newcomer which purchased the property in question with full awareness of the regulatory provisions of the local zoning ordinance which had predated the synagogue's interest in the property by 20 years. Beyond that this synagogue comes not to serve the religious or other needs of residents of Roslyn Harbor but of members of its own congregation from nearby municipalities. Thus only 4 of the 125 *295 member families live in the Village of Roslyn Harbor; 55 families live outside the village limits in the densely populated Roslyn area south of Northern Boulevard; 27 families live miles away in the Great Neck area; and 26 families live in scattered other places on the North Shore. There is no evidence in the record before us that respondent synagogue could not have found an appropriate available location elsewhere in the Village of Roslyn Harbor or in one of the adjoining municipalities. It does not appear that an appropriate synagogue facility could not be constructed on the 2.4-acre parcel with full observance of the prescribed 100-foot sideline setbacks. It is true that respondent synagogue could not use the buildings presently located on the property and that new construction would be expensive  but all this was well known to it when the recently organized synagogue purchased the premises.
Given the reasonable expectation that use of the premises on Glenwood Road for synagogue purposes will surely increase vehicular traffic in the area and create parking problems, not only endangering the comfort and convenience of residents of the community but also creating hazards to public health and safety, we cannot conclude that there are constitutional or other legal considerations which preclude the application of what to us are the reasonable provisions of this zoning ordinance to this property owner in the circumstances presented in this record. Rather we would conclude that there is a reasonable relationship between the zoning regulation as sought to be applied here and the public health, safety and general welfare of the Village of Roslyn Harbor, and that the application of such regulation would not infringe the legitimate interests of respondent synagogue. The time has come when our court should forthrightly face the legal, economic and social implications of continued slavish adherence to the outmoded doctrine that churches and synagogues are wholly immune from even reasonable zoning regulation.
We would reverse the order of the Appellate Division and remit the case to Supreme Court, Nassau County, for entry of judgment declaring sections 11-2.14 and 11-2.30 constitutional as applied to respondent synagogue.
Order affirmed, with costs.
NOTES
[1] It has been argued here that the Westchester case ought not to apply to these facts because, in that case, the church already occupied property at the chosen location and its expansion was the subject of the dispute. But we said explicitly, in Westchester, that the considerations which apply to initial location and those which apply to planned expansions are identical. (22 N.Y.2d 488, 493.)
[2] There is also involved here a request for a variance of the setback requirements to accommodate the location of the guest house which will be used to house the congregation's Rabbi. While it presently meets residential requirements, under the village's zoning ordinances, it becomes an accessory use to the main building and is thus required to have a larger setback. Our rulings with respect to the primary setback dispute apply with equal force to the guest house setback.
[3] We note that the original decision of the zoning board states that body's recognition of the synagogue's offer to meet any reasonable requirement for modification or adaptation in order to bring the structures within existing requirements. The synagogue also consented to continuing jurisdiction of the board for as long as necessary in order to assure the board that all such requirements had been met.
[4] But see North Shore Unitarian Soc. v Village of Plandome (200 Misc 524); Pelham Jewish Center v Marsh (10 AD2d 645).