In the Matter of HERBERT HARRIS, Appellant, v JAMES WARDE, Individually and as Commissioner of the Department of Mental Health of the County of Erie, et al., Respondents.

Fourth Department, May 27, 1977

*Jason Karp* for appellant.

*Phillips, Lytle, Hitchcock, Blaine & Huber (Paul Jones* of counsel), for Benjamin F. Murphy and another, respondents.

*James Magavern (Robert Nisely* of counsel), for James Warde and another, respondents.

SIMONS, J. Petitioner is a 32-year-old former heroin addict who has been treated under the methadone maintenance treatment program since 1968. Admittedly, his progress has been remarkable. Addicted at age 15, he suffered all of the maladies incident to that affliction, including a series of arrests for drug or drug-related offenses. He has tried detoxification programs in State and Federal facilities over 20 times

and undertaken various other counseling and rehabilitative services, all without success. It was not until his voluntary submission to methadone treatment that his heroin addiction was controlled and he was able to return to a stabilized existence. He returned to high school and graduated with honors, graduated from Fordham University cum laude in 1973 and is presently a third-year law student at the State University of New York at Buffalo.

From 1968 until 1974 petitioner participated in a methadone maintenance treatment program in New York City. Upon entering law school, he became a voluntary patient in a similar program at respondent Sisters of Charity Hospital in Buffalo. Until recently, petitioner visited the hospital on Wednesday and Sunday of each week and orally ingested his daily requirement of liquid methadone. On these visits he was also given a supply of the drug to be self-administered on intervening days. On February 11, 1976 respondent, Dr. Benjamin F. Murphy, the director of the program, ordered that commencing on April 1, 1976 all methadone patients would be required to "go on a daily schedule with a Sunday take-out". Patients who were unwilling to make daily visits to obtain their medication were given the opportunity to request detoxification. Dr. Murphy's order was premised upon his belief that patients with liberal take-out privileges were not working toward eventual withdrawal from methadone and the achievement of a drug free state, but instead, were being maintained on methadone on an indefinite basis.

Petitioner brings this article 78 proceeding to invalidate Dr. Murphy's directive and to enjoin[1] respondents from enforcing it. What petitioner really seeks, however, is mandamus relief, forcing cancellation of the directive, at least insofar at it applies to him, and compelling respondents to restore his twice weekly pick-up privileges. He asserts that the order is affected by errors of law; is arbitrary, capricious and an abuse of discretion; and that it is constitutionally invalid in that the methadone maintenance program involves "State action" which conferred upon him a benefit which cannot be withdrawn without prior notice, confrontation and an opportunity

---

1. Injunctive relief is ordinarily not available in an article 78 proceeding (*Matter of Edelman v Baumgartner,* 12 AD2d 922; *Matter of Daniels v Daniels,* 3 AD2d 749; 23 Carmody-Wait 2d, NY Prac § 145:80; cf. *Matter of Policemen's Benevolent Assn. of Westchester County v Board of Trustees of the Vil. of Cronton-on-Hudson,* 21 AD2d 693, 694).

to be heard. With these broad allegations he would cast upon respondents the burden of justifying their action. Special Term dismissed the petition and we affirm its order.

Mandamus is the means by which a public body or officer is compelled to perform a duty imposed by law. It is available only when petitioner demonstrates a clear legal right to the relief requested *(Matter of Small v Moss,* 277 NY 501, 507; see, generally, 23 Carmody-Wait 2d, NY Prac, §§ 145:22-145:25, 145:112-145:118). Even if this private hospital and its staff doctors are considered agencies of the State, the directive is a medical and professional judgment made in the exercise of discretion and is not subject to mandamus *(Matter of Currie v Bixby,* 40 AD2d 341, 344; see, generally, *Matter of Gimprich v Board of Educ.,* 306 NY 401; *Matter of Williams v Bryant,* 57 AD2d 717; *Matter of Posner v Levitt,* 37 AD2d 331).

The use of methadone maintenance to detoxify heroin addicts is a relatively recent program. There are serious differences of opinion in medical circles about the proper course which should be followed in the treatment of addicts. Some authorities believe that the patient should be stabilized and maintained on a high dose of methadone with as little pressure as possible upon him to reduce his dosage. Emphasis is placed on the patient's ability to function in society, not on his ability to become detoxified. Other authorities, believing that the purpose of the program is to detoxify the patient not only from heroin but also methadone, advocate the so-called "low dose" program in which the patient's dosage is gradually reduced so that he remains under medication for as short a time as possible. (The opposing views are discussed more fully in *Beazer v New York City Tr. Auth.,* 399 F Supp 1032, 1040-1041.) Petitioner subscribes to the former theory and he includes among his moving papers respectable medical authority to support his view. Dr. Murphy, as evidenced by his order, advocates the "low dose" theory. Indeed, both the parties may find support for their positions in the regulations, for they provide that the goal of methadone maintenance treatment is detoxification of the addict by reduced dosages of the drug (21 CFR 310.505 [a] [3]; 14 NYCRR 2021.5), although the State regulations recognize that treatment may require stabilization and detoxification over long periods of time (14 NYCRR 2021.3 [c], [d]). This divergence of opinion epitomizes our problem. The members of this court may prefer one theory or the other but we are not competent to make the decision as to which of

the two conflicting methods of treatment should be chosen to achieve the goal of the program. The choice is not one to be made by Judges or the patient but rather one that should be made by doctors.

Petitioner, relying upon various sections of the State regulations, finds a duty imposed upon respondents (and a correlative right vested in him) to continue his twice per week schedule for obtaining his medication unless respondents justify the increase in frequency of pickups because petitioner has violated some provision of the regulations. The regulations grant him no such right.

Some background is helpful before interpreting the regulations upon which the petitioner relies. Under Federal and State laws and regulations methadone may be distributed for use in approved treatment programs. New York State provides treatment through local agencies, either directly or by contracting with "providers". Respondent Sisters of Charity Hospital has such a contract with respondent Erie County Department of Mental Health to conduct a methadone program. Both the Federal and State regulations set forth requirements for the types of persons who may be admitted to the program, the kinds of services which must be rendered, the staffing required for administering the program, the days and hours of operation, the method of record keeping, required controls on the administration of methadone, and mandated tests to detect diversion, theft or illicit drug use by the patient. The provider's contract may be revoked at any time if it fails to comply with these regulations. Implicit throughout the regulations is recognition of the fact that methadone is a dangerous addictive drug and that its use and distribution must be carefully controlled.

Participation in the program by the addict is voluntary. Upon entering it he signs a contract consenting to treatment and to the procedures and methods necessary in the professional judgment of the Medical Director.[2] The addict may

---

2. The consent agreement must contain the following statement of treatment goals:

"The goal of methadone treatment *is total rehabilitation of the patient.* Eventual *withdrawal from the use of all drugs,* including methadone, is an appropriate treatment goal. I realize that for some patients methadone treatment may continue for relatively long periods of time but that *periodic consideration shall be given concerning my complete withdrawal from methadone use.* * * *

"I also understand that during the course of treatment, certain conditions may make it necessary *to use additional or different procedures than those explained to me.* I understand that these alternate procedures shall be used *when in the Program*

withdraw from the program at any time (21 CFR 310.505 [d] [3] [i]; 310.505 [d] [3] [k] [4]). For its part, the provider is given broad ‘discretion to reject applicants for treatment, if it believes that they will not benefit from the program and to discharge those patients who it believes are no longer benefited by treatment (21 CFR 310.505 [d] [3] [v]; 14 NYCRR 2021.13 [h]).

The regulations also provide guidelines for reducing the frequency of clinic visits, so that the treatment will result in less interference with the patient's work and home life (see 21 CFR 310.505 [d] [7]). As a patient admitted to the program for more than two years, petitioner qualified for "two clinic visits per week for ingestion of methadone under observation; no more than three take-home doses at any time and no more than a total of five take-home doses weekly" (14 NYCRR 2021.13 [c] [1] [iii]). Petitioner was placed upon such a schedule immediately upon his entry into the Sisters Hospital program because as a long-time methadone patient in another facility, it was determined that he qualified for this benefit. The decision to reduce the frequency of a patient's clinic visits is discretionary and unquestionably petitioner could have been denied twice weekly privileges despite his long participation in the program. However, petitioner contends that once he had been given the privilege of reduced clinic visits, he acquired a right or privilege to continue on that pick-up schedule, a right which Dr. Murphy could not abridge unless he established that petitioner had violated some provision in the regulations. He contends and the dissent agrees, that this right is derived from two State regulations. The first (14 NYCRR 2021.13 [c] [2] [i]) provides that the patient's take-home privileges *shall* be withdrawn immediately upon (1) two consecutive urine specimens negative for methadone, (2) evidence of diversion or (3) loss of medication more than once a month. Far from conferring any special rights on the patient, the section is a compulsory governmental control to avoid drug theft and diversion by the patient. The provider must comply with the stated standards or risk losing its approval.

The second section cited *(id.,* 2021.13 [c] [2] [ii]) sets forth the circumstances under which take-home rights *may be granted* the patient and the first paragraph of that regulation provides that "the following forms of behavior would tend to *contrain-*

*or Medical Director's professional judgment it is considered advisable."* (21 CFR 310.505 [k] [4]; emphasis added.)

*dicate* a *decrease* in clinic visit frequency, and should be considered * * * as a possible indicia of a need for *increased* clinic visit frequency:" (emphasis added). It then lists illustrative types of improper patient behavior[3] which should be considered when denying or withdrawing take-home privileges. The final subclause, [g], permits an increase of clinic frequency for "other inappropriate behavior". It is difficult to conceive of a broader grant of discretionary authority to the Medical Director and, indeed, the pertinent Federal regulations provide circumstances under which frequency of visits is to be adjusted at the discretion of the director (see 21 CFR 310.505 [c] [6], [7]; 310.505 [d] [8]).

Contrary to the assertions of petitioner adopted by the dissent, these regulations do not set forth mandatory standards which must be followed before the provider may increase frequency; they confer no right on the patient and they do not diminish the authority granted to the Medical Director in the regulations and by petitioner's contract to increase clinic visits when an increase is required in the director's professional judgment.

Even if we were permitted to second-guess a doctor's medical judgment, we find no impropriety in Dr. Murphy's directive or the reasons which prompted it. Neither did the county when its officials advised the doctor that he was authorized to take this action. The doctor's reasons for issuing the directive and its intended effect are entirely consistent with the aims of the methadone program as stated in Federal and State regulations.

Nor do we find Dr. Murphy's ruling arbitrary or illegal insofar as it applies to this petitioner. As has already been noted, the purpose of the program is to detoxify addicts, not just from heroin but also from methadone. Towards this end,

---

3. The forms of behavior are:

"(a) abuse of controlled substances as evidenced by patient's statements, physical examination, positive urinalyses for non-prescribed drugs;

"(b) falsification of urine specimen;

"(c) self-administration of methadone in a way other than prescribed;

"(d) irregular attendance;

"(e) refusal to participate in other program components, if such participation has been deemed necessary by the professional staff;

"(f) acting-out behavior including violence or threats of violence toward patients and staff in the clinic;

"(g) evidence that patient is involved in other inappropriate behavior." (14 NYCRR 2021.13 [c] [2] [ii].)

the regulations provide that a reduction of visits to the clinic is a privilege (14 NYCRR 2021.13 [c] [2]), that there shall be no reduction in frequency where the patient's daily dosage is above 100 milligrams, without State and Federal approval (21 CFR 310.505 [d] [6] [i] [c]), and that it shall be the goal of methadone treatment to discontinue a patient's treatment within two years. The case of any patient continued on methadone for longer than two years must be reconsidered periodically to determine whether the patient's treatment should be discontinued (21 CFR 310.505 [d] [8]). Considering the standards established by these regulations and the facts that this petitioner has been upon methadone maintenance since 1968[4] and that his average daily dosage during this period of time has never been less than 90 milligrams and has fluctuated between 90-110 milligrams, there was nothing unreasonable in the doctor's directive. He required the petitioner to participate in increased clinic visits in a reasonable effort to lessen petitioner's dependence on the drug and in furtherance of the objects of the program, reduction of dosage and detoxification.

Petitioner alleges that his personal circumstances were ignored by Dr. Murphy. He stated his case in separate letters to Dr. Murphy and Mr. Lipton of the County Department of Mental Health and he met personally with Dr. Murphy to discuss the impact of the directive upon his law school program. The doctor varied the hours during which petitioner could obtain his daily pickup, but evidently considered petitioner's complaints insufficient to warrant any other special consideration. There is no legal significance in the fact that review of petitioner's complaints came after Dr. Murphy's directive rather than before it was issued. The fact remains that petitioner did receive the personalized consideration which he claims he was denied and Dr. Murphy, in the exercise of his professional judgment, found no reason for excepting petitioner from the directive requirements.

Special Term's judgment dismissing the petition should be affirmed.

CARDAMONE, J. (dissenting). Petitioner has properly instituted an article 78 proceeding to review what he contends is

---

4. By way of comparison, in the class action involving methadone patients in New York City *(Beazer v New York City Tr. Auth.,* 399 F Supp 1032, 1042, *supra),* the court stated that the record contained no case in which a patient was treated for a period longer than four years.

arbitrary and capricious official action taken by respondent Dr. Murphy against him. Freedom from the need for drugs is the underlying purpose of the governmental program. Such is not disputed. Neither is the medical course followed to achieve this goal—high or low methadone dosage—at issue here. The question is whether petitioner as a recipient of medical help for drug abuse is protected from an alteration of his twice weekly methadone pickup schedule caused by an arbitrary and capricious directive made in contravention of the controlling governmental regulations. In my view he is entitled to such protection.

The majority hold that the State regulations do not grant petitioner any right to continue his twice weekly schedule for obtaining his medication even if respondents fail to justify the increase in frequency of pickups in accordance with the regulations. This holding is based upon the fact that implicit throughout the regulations is the recognition that methadone is a dangerous addictive drug, that its use and distribution must be carefully controlled, that participation in the program is voluntary and that the provider is given great discretion in administering the program. The majority also hold that the regulations confer no right upon a voluntary recipient who it believes enters the program on a "take-it-or-leave-it basis". Therefore, the majority implicitly conclude that devoid of rights the recipient is remediless against the provider's actions. I am unable to agree with this conclusion and must dissent from it.

Petitioner here was granted the privilege of obtaining methadone on a twice-a-week schedule pursuant to the applicable regulations enacted under the authority of the Mental Hygiene Law (Mental Hygiene Law, § 81.09, subd [q]; § 81.38) which specifically prescribe the criteria which shall govern the scheduling of hospital or clinic visitation for methadone patients (14 NYCRR 2021.13 [c]). As a patient admitted to the program for more than two years, petitioner qualified for "no less than two clinic visits per week for ingestion of methadone under observation; no more than three take-home doses at any time and no more than a total of five take-home doses weekly" (14 NYCRR 2021.13 [c] [1] [iii]). Petitioner was placed upon such a schedule immediately upon his entry into the Sisters Hospital program because, as a long-time methadone patient in another facility, it was determined that he qualified for this benefit. That privilege once granted may only be withdrawn,

however, within the guidelines set forth in the regulations. It is petitioner's claim, with which I agree, that his privilege was improperly and arbitrarily withdrawn outside the parameters of the discretion vested in the director.

Concededly, petitioner's participation in this program is entirely voluntary. Upon his admission into it he executed the required consent agreement (21 CFR 310.505 [k] [4]) which, in addition to acknowledging that "[e]ventual withdrawal from the use of all drugs * * * is an appropriate treatment goal", also recognized the discretionary authority of the program director to employ alternate procedures during the course of treatment. Such discretion, however, must be exercised in conformity with the standards established in the regulations. It is clear that the regulations establish the criteria and indicia upon which the administrative officer shall base his determination as to the need or desirability of increased clinic visitation. Contrary to the majority's conclusion, the discretion accorded the program director while vast, is not completely unfettered.

I dissent further because the program director's determination to increase methadone pickup without regard to individual petitioner exceeded the discretion granted him under the regulations. Implicit in both the Federal and State regulations is the requirement that the frequency of methadone clinic visits and counseling, as well as the methadone dosage, be adjusted according to the individual medical record and needs of each patient. The Federal regulations set forth examples of individual patient considerations that may justify adjustment of methadone pickup frequency. These include incompatibility of daily attendance at a program facility with gainful employment, education and homemaking, the individual's rehabilitative progress through active program participation, and the individual's adherence to program requirements. It requires that prior to reducing visit frequency, "documentation of the patient's progress and the need for reducing the frequency of visits shall be recorded." (21 CFR 310.505 [d] [7].) The purpose of the regulation is to ensure that pickup frequency be related to the MMTP patient's individual record and needs. The same requirement applies equally to increases in pickup frequency. Support for this conclusion is found in the State regulations which impose a consideration of individual patient-related criteria in scheduling of "clinic visits," without specifying whether the criteria applies to increases or decreases in visit

frequency (14 NYCRR 2021.13 [c]). This State regulation plainly states that "[s]cheduling of clinic visits *shall be governed* by the following criteria" (emphasis added). This mandatory language imposes a nondiscretionary duty upon the program director of individualized consideration on a patient-by-patient basis. Further, under the State regulations the indicia of the need for increasing the frequency of clinic visits include the individual patient's drug abuse, irregular attendance, violent behavior, urine specimen falsification or improper self-administration of methadone (14 NYCRR 2021.13 [c] [2] [i], [ii]). Such findings as to petitioner do not appear in this record.

While the final decision whether any or all of these factors set forth in the regulations justify adjustment of pickup frequency rests within the discretion of the MMTP director, nontheless, the initial consideration of the impact of the existing or altered pickup schedule upon the individual MMTP patient based on his individual record and need is mandatory. No such finding with respect to petitioner appears in the record, nor, indeed, was such ever made.

The majority states that petitioner did receive personalized consideration, but it offers no specific example of any of those considerations set forth in the regulations (21 CFR 310.505 [d] [7]). The reference to "personalized consideration" apparently is to petitioner's discussion on March 19, 1976 with Dr. Murphy. However, this was no more than an attempt by petitioner to complain of his inclusion in the generalized blanket treatment promulgated regarding methadone pickup rescheduling and to request the individualized medical consideration to which he was entitled. At that meeting, Dr. Murphy merely reiterated his previously made decision to impose across-the-board daily pickup requirements on *all* MMTP patients. This sort of consultation can hardly be said to satisfy the individualized findings requirements of the regulations.

Further, the specific regulations cited by the majority to support their contention that the frequency of visits shall be adjusted merely at the discretion of the director *in fact* subject the director's discretion to the individual patient's needs as ascertained from his clinical record. Thus, 21 CFR 310.505 (d) (8) states that "[m]aintenance treatment using methadone shall be discontinued within 2 years after such treatment is begun unless, based upon *clinical judgment recorded in the clinical record for the patient, the patient's status indicates*

*that such treatment should be continued for a longer period of time.* Any patient continued on methadone for longer than 2 years shall be subject to periodic reconsideration for discontinuance of such treatment" (emphasis supplied). Such plainly confers upon the director the discretion to engage in *review* of the individual patient's record, but *actual discontinuance* is specifically made subject to individualized consideration of the clinical record. The exercise by the director of his discretion must be based upon and find support in the individual petitioner's clinical record. The regulations plainly do not allow for a reduction of methadone take-home privileges or for an increase of clinical visit frequency on the basis of administrative convenience or the clinical performance of *all* the patients as averaged from an overview of the records of *all* recipients.

Finally, the direction of respondent, Dr. Benjamin Murphy (Program Director), is invalid because it exceeds the scope of the authority conferred upon him by the regulations promulgated pursuant to article 81 of the Mental Hygiene Law. Generally courts will not interfere with the exercise of discretion conferred by law upon an administrative officer. Where, however, such discretion is defined and circumscribed, as it is here, it must be exercised within approved formulated standards (cf. *Matter of Levine v Whalen,* 39 NY2d 510; see, also, *Matter of Community Synagogue v Bates,* 1 NY2d 445; *Matter of Small v Moss,* 279 NY 288). To hold, as the majority do, negates the importance of *individualized* medical treatment, fail to take into account the individual patient's case history and relegates the dispensation of treatment to an inflexible shuffling of addicts through a bureaucratic procedure. The very nature of the standards presumes a consideration of the individual medical and other factual circumstances of each particular patient. Applying these criteria, it follows that Dr. Murphy's directive that commencing on April 1, 1976 all patients would go on a daily schedule with a Sunday take-out is overbroad and without support in the regulations. Standing alone, as a policy directive to be applied to *all* patients without consideration of individual circumstances, the directive constitutes arbitrary action by an administrative officer (cf. *Matter of Small v Moss, supra,* p 299).

The majority attempt to justify the directive by considering factors which, had the director considered them with respect to this individual petitioner, would have provided a basis for the action taken. The discretion is vested in the medical

director of this program and not in this court. Accordingly, I dissent and vote to reverse and remit the matter to the medical director for him to exercise his discretion in accordance with the governing regulations.

MOULE, J. P., DILLON and WITMER, JJ., concur with SIMONS, J.; CARDAMONE, J., dissents in an opinion and votes to reverse the judgment and remit matter to the Medical Director.

Judgment affirmed, without costs.