NEEDHAM PASTORAL COUNSELING CENTER, INC. *vs*. BOARD OF APPEALS OF NEEDHAM.

No. 89-P-244.

Norfolk. March 15, 1990. - July 19, 1990.

Present: WARNER, C.J., KASS & JACOBS, JJ.

*Zoning*, Religious use. *Words*, "Religious purposes."

Proposed use of space in a church building as offices and counseling rooms for a psychological counseling center open to the general public was not a "religious purpose" within the meaning of the exemption from zoning regulation contained in G. L. c. 40A, § 3. [34-38]

CIVIL ACTION commenced in the Superior Court Department on March 4, 1986.

The case was heard by *William H. Welch*, J.

*Thomas F. O'Hare* for the plaintiff.

*Deirdre D. Donohue* for the defendant.

*Earl W. Trent, Jr.*, of Pennsylvania, for The American Baptist Churches in the U.S.A., amicus curiae, submitted a brief.

KASS, J. Needham Pastoral Counseling Center, Inc. (NPCC), proposes to remodel 864 square feet of space in a church building as offices and counseling rooms for a psychological counseling center with a spiritual component. The question is whether the proposed use is for "religious purposes" within the meaning of G. L. c. 40A, § 3, as inserted by St. 1975, c. 808, § 3, which exempts from zoning regulation "the use of land or structures for religious purposes or for educational purposes . . . ."[1] We conclude that what

---

[1] Structures used for religious purposes may be regulated as to bulk and height, yard sizes, setbacks, open space, parking, and so forth. G. L. c. 40A, § 3. *Newbury Jr. College* v. *Brookline*, 19 Mass. App. Ct. 197, 205 (1985). For the history of the special zoning status of religious and

NPCC plans to offer resembles a mental health clinic more than religious activity. A building permit was, therefore, rightly denied.

NPCC claims entitlement to a building permit as matter of right on the basis of the religious purposes exemption.[2] The church structure in which NPCC wishes to locate is in a single residence B district which excludes business. When the inspector of buildings of Needham denied a building permit (he withheld his approval because he thought "the proposed use is not unlike any other business use"), NPCC took an appeal under G. L. c. 40A, § 13, to the board of appeals. That body, after hearing, determined that the NPCC proposal was essentially a professional service establishment and, thus, not permitted at the locus. Judicial review pursuant to G. L. c. 40A, § 17, followed. A judge of the Superior Court ruled that the board's decision did not exceed its authority.

Before examining the facts, in which the answer to the question presented lies, it will be useful to state the principles of law which apply to those facts.

No special weight attaches to either the conclusions of law or findings of fact of a board of appeals on judicial review under G. L. c. 40A, § 17. The trial judge hears the matter de novo and "determine[s] the legal validity of the decision of the board upon the facts" which the judge finds. *Josephs* v. *Board of Appeals of Brookline*, 362 Mass. 290, 295 (1972). *DiGiovanni* v. *Board of Appeals of Rockport*, 19 Mass. App. Ct. 339, 348 (1985). This is not a case where the judge owes deference to the discretion exercised by the board. See *Fitchburg Hous. Authy.* v. *Board of Zoning Appeals of Fitchburg*, 380 Mass. 869, 871 (1980). Compare

---

educational institutions in Massachusetts, see *The Bible Speaks* v. *Board of Appeals of Lenox*, 8 Mass. App. Ct. 19, 27 n.10 (1979).

[2]In its application to the board for relief, NPCC, by way of postscript, also asked for a special permit as authorized in G. L. c. 40A, § 9. Impliedly that request was rejected when the board, in a detailed decision, affirmed the decision of the inspector of buildings. Before the Superior Court and before us NPCC has pitched its case entirely on its right to a building permit by reason of the religious purpose exemption in § 3.

*Subaru of New England, Inc.* v. *Board of Appeals of Canton,* 8 Mass. App. Ct. 483, 487-488 (1979).

By limiting the restrictions which municipalities may place on use for religious purposes, the Legislature sought to ensure that a city or town could not "exercise its preferences as to what kind of . . . religious denominations it will welcome. . . ." *The Bible Speaks* v. *Board of Appeals of Lenox,* 8 Mass. App. Ct. 19, 33 (1979). *Southern New England Conference Assn. of Seventh-Day Adventists* v. *Burlington,* 21 Mass. App. Ct. 701, 705-706 (1986).

What the phrase "religious purposes" means is a question of law for the court, *Kurz* v. *Board of Appeals of N. Reading,* 341 Mass. 110, 112 (1960), "to be determined by the ordinary principles of statutory construction." *Framingham Clinic, Inc.* v. *Zoning Bd. of Appeals of Framingham,* 382 Mass. 283, 290 (1981). As was the case with "educational use" in the *Kurz* case and "agricultural use" in *Moulton* v. *Building Inspector of Canton,* 312 Mass. 195, 198 (1942), the words to be construed are everyday ones and should be interpreted in accordance with common usage, without artificial enlargement or contraction, and free from the court's "own conceptions of expediency." *Commonwealth* v. *S.S. Kresge Co.,* 267 Mass. 145, 148 (1929). *Worcester County Christian Communications, Inc.* v. *Board of Appeals of Spencer,* 22 Mass. App. Ct. 83, 89 (1986). Other legal contexts and dictionary definitions are helpful. *Framingham Clinic, Inc.* v. *Zoning Bd. of Appeals of Framingham,* 382 Mass. at 290. *Building Inspector of Mansfield* v. *Curvin,* 22 Mass. App. Ct. 401, 402-403 (1976).

Religious purpose, in a dictionary sense and without judicial gloss, means something in aid of a system of faith and worship, usually of a higher unseen power entitled to reverence. See the discussion of the noun "religion" and the adjective "religious" in The Oxford English Dict. 2481 (compact ed. 1971) and Webster's Third New Intl. Dict. 1918 (1968). Fidelity to a set of principles or rituals is a central characteristic.

In the judicial universe, attempts at definition of "religion," as one might expect, have been concentrated in cases involving that portion of the First Amendment to the United States Constitution which provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Early decisions resembled the dictionary approach. See, e.g., *Davis* v. *Beason*, 133 U.S. 333, 342 (1890), and the dissent of Chief Justice Hughes in *United States* v. *Macintosh*, 283 U.S. 605, 633-634 (1931)[3] : "The essence of religion is belief in a relation to God involving duties superior to those arising from any human relation." Later efforts have been more expansive. A deity was no longer of the essence. *Torcaso* v. *Watkins*, 367 U.S. 488, 495 n.11 (1961). In *United States* v. *Seeger*, 380 U.S. 163, 166, 176 (1965), the Court described religion as a "belief that is sincere and meaningful [and] occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God" of conventional religious systems. Ultimate concern about life, death, and relation to the universe are among the ingredients. *Malnak* v. *Yogi*, 592 F.2d 197, 208 (3d Cir. 1979). The leading cases are discussed and a synthesis assayed in Note, Toward A Constitutional Definition of Religion, 91 Harv. L. Rev. 1056 (1978). See also Tribe, American Constitutional Law § 14-6 (2d ed. 1988).

It is all very heady business and defies precision, but we emerge with the understanding that what is religious requires a system of belief, concerning more than the earthly and temporal, to which the adherent is faithful. Fortunately, the subject at hand is land use, not philosophy, and, in the more prosaic context of the former, the puzzle begins to unravel.

We may now turn to the facts.[4]

NPCC had its genesis in 1976 with the wish of ministers of the Congregational Church of Needham to make pastoral

---

[3]The *Macintosh* case was overruled by *Girouard* v. *United States*, 328 U.S. 61 (1946).

[4]The trial judge found the facts necessary to decision and his findings are fully supported by the record. In our narrative we shall occasionally flesh out those findings with material from the record which is undisputed.

counseling available at their church. To extend its reach be-
yond that parish to the wider Needham community, the pas-
toral counseling practice[5] transformed itself into an ecumeni-
cal center, moved from the Congregational Church, and
affiliated with the Andover-Newton Theological School,
where it is currently housed.

By way of underscoring the continuity between pastoral
counseling and church activity, NPCC undertook to relocate
in a church and made arrangements to that end with the
First Baptist Church in Needham ("the church"). The legal
relationship worked out between the church and NPCC was
that of landlord and tenant. NPCC would lease the 864
square-foot locus, so far as appears at a fair market rent, for
ten years and remodel it into a counseling room, a director's
office, and a waiting room. There would be six counselors and
a director. Those six counselors would see — as they did at
the time of trial — approximately 120 clients per week.
Counseling sessions last about fifty minutes, for which
NPCC charges fees from $35 to $50 per session.[6] After de-
ducting overhead costs (e.g., rent, the salary of the director),
and, in the case of interns from Andover-Newton, tuition
costs, NPCC turns over fees collected to the individual coun-
selors, who are independent contractors, not employees.

Among the life problems which pastoral counselors treat
are depression, grief, marital difficulties, substance abuse, job
stress, loneliness, and absence of meaning, purpose, or direc-
tion in life. To those ills they bring to bear psychological
training in such therapeutic techniques as dream interpreta-
tion, interpretation of intrapsychic conflict, transference in-
terpretation, clarification, and confrontation. The counselors
see themselves as "doing primarily long-term insight-oriented
psychotherapy and shorter-term systems therapy." Folded
into these secular psychological techniques, there is a layer of

---

[5]As we follow the record, NPCC took on nonprofit corporate status in
1983.

[6]Counselors accredited by the American Association of Pastoral Coun-
selors were billed out at $50 per session, trainees at $35. As matter of
policy, NPCC would render service to clients unable to pay "so long as
this policy does not destroy the stability of the center."

theological content. The counselors, who are ordained clergy or similarly trained in theology, believe that reconciliation with God, a minimum of separation from God, and a maximum of devotion to God's will are the means to alleviation of anxiety and internal conflict. As healing, guiding, and reconciling souls with God are significant components of pastoral counseling, major faiths recognize pastoral counseling as a form of ministry — much as service as a chaplain.

In the spirit of ecumenicism, NPCC is open to the general public; its clientele is not limited to Baptists, Christians, or even believers in God. By design, clients are not necessarily paired with counselors of their own religious persuasion. Counselors do not espouse to their clients any particular religious doctrine, and, in accordance with the code of ethics of the American Association of Pastoral Counselors, they do not proselytize. Atheists or people with no religious beliefs may be clients of NPCC.

The trial judge found that the services of NPCC and its methods of delivering them are not signficantly different from what a neutral observer coming upon the scene would size up as a mental health center applying standard psychological and psychiatric techniques. Some theological, inspirational, or spiritual content does not automatically imbue an activity with religious purpose. An element of religion subsidiary to the dominant secular use does not convert that use to one which is for religious purposes any more than an element of education converts a residential facility for elderly persons to a use for educational purposes. As to an example of the former, see *Worcester County Christian Communications, Inc.* v. *Board of Appeals of Spencer*, 22 Mass. App. Ct. at 88-89, involving radio broadcasting facilities to be used for four hours of transmission of devotional and inspirational material out of eighteen hours of air time; as an example of the latter, see *Whitinsville Retirement Soc., Inc.* v. *Northbridge*, 394 Mass. 757, 760-761 (1985).

Focusing on the use rather than the sponsoring organization reinforces the conclusion that religious purpose is not the dominant element, and it is use with which zoning laws are

concerned. *CHR Gen., Inc.* v. *Newton*, 387 Mass. 351, 356 (1982). *Gamsey* v. *Building Inspector of Chatham*, 28 Mass. App. Ct. 614, 616 (1990). The activity concerned is not an enterprise of the landlord church and is not designed primarily for the parishioners of that church. Specific religious doctrine is subordinated, and the doctrinal faith of the counsellors is to play no role in the counseling sessions. The readiness to give psychological counseling to nonbelievers illustrates that, depending on the reaction of the particular client, religion may be absent from certain counseling sessions altogether.

We ascribe comparatively little weight to the fee structure. Certainly the fee for service and allocation of costs formula described by the testimony resembles charges of a group psychology practice more than a charge to defray institutional expense. We hesitate to make too much of the payment factor only because it is commonplace for religious organizations to charge fees for participation on their premises in such things as religious education, day care, scouting, sporting activities, and publications. See, e.g., *Feldstein* v. *Christian Science Monitor*, 555 F. Supp. 974, 978 (D. Mass. 1983).

Religious activity, to be sure, may involve more than prayer and worship, see, e.g., *Community Synagogue* v. *Bates*, 1 N.Y.2d 445, 453 (1956), and there is a variety of accessory uses that have been held encompassed by the religious purpose exemption. In addition to the activities mentioned in the preceding paragraph, there are also public affairs programs, art and music programs, drug rehabilitation programs, and recreation programs.[7] For a collection of the cases, see 2 Rathkopf, Zoning & Planning § 20.03 (Ziegler rev. ed. 1990). In order to qualify as an activity accessory to a religious institution, the members and staff of the institution are generally involved in the activity. So, for example, in *Nally* v. *Grace Community Church of the Valley*, 47 Cal.3d

---

[7]Although a New York court thought that a swimming pool and gymnasium went beyond the merely accessory. See *Temple Israel* v. *Plaut*, 10 Misc. 2d 1084, 1087 (N.Y. Sup. Ct. 1957).

278, 284 (1988), pastoral counseling was offered to church members. The counselors were connected with the church and expressly disavowed running "a counseling center as such." *Ibid.*

Factors which describe a use of a real estate which is not primarily for religious purposes predominate. For that reason the board acted within its authority in denying a building permit to the plaintiff.

We need not consider the argument that the board has denied to NPCC the free exercise of religion protected by the First Amendment. General Laws c. 40A, The Zoning Act, in § 3, adopts the constitutional principle that local authority may not, without compelling State interest, use zoning regulations to burden religious practices (cf. *Cantwell* v. *Connecticut*, 310 U.S. 296, 303-304 [1940]; *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 374-375, cert. denied, 459 U.S. 970 [1982]) or discourage particular denominations or beliefs (*The Bible Speaks* v. *Board of Appeals of Lenox*, 8 Mass. App. Ct. at 33). As we have determined that NPCC's activity, however much an extension of the ministry of the counselors, is not in its essential nature a religious use, constitutional protection accorded religious uses is academic.

*Judgment affirmed.*