Brassard, J.
This case involves two actions which were consolidated for trial. Evidence was presented on May 20, 1998, and counsel made oral argument on May 21, 1998. The first case, Civil Action No. 96-03176, is an appeal under G.L.c. 40A, §17 from a decision of the Acton Board of Appeals (the “board”) denying John E. Norton and Sheila Norton (the “Nor-tons") a special permit for an apartment in a detached building on their lot. The second case, Civil Action No. 97-06527L, is a complaint for enforcement of the by-law against the Nortons. The enforcement complaint by the building commissioner seeks injunctive relief.
Based on all of the credible evidence, I make the following findings of fact.
1. The Nortons reside at and own the property at 95 Hammond Street, in Acton. The Nortons acquired the property in 1974, subdivided the property on more than one occasion, and locus now consists of approximately 2.49 acres.
2. The board is a duly constituted municipal board and is the special permit granting authority with respect to special permits, including the permit to construct an apartment within a detached building located on the same lot as the building containing the principal unit under the Town of Acton Zoning By-Law (the “by-law”). The individual defendants were the members of the Board of Appeals at the time the complaint was filed.
3. The locus, 95 Hammond Street, is located in an R-4 residence zoning district and has been located in the single family residential district since December 1953, when the zoning by-law was first adopted.
4. The parties have stipulated, and the Court therefore finds, that a foundation measuring twenty-four feet by sixty feet was constructed at the rear of the locus in 1950. The parties have stipulated, and the Court therefore finds, that the “foundation was covered with wood and tar paper or tarpaulins and used for the storage of personal property.”
5. The foundation was on the property when the Nortons acquired the property in 1974. Apart from the stipulation of fact, no evidence was presented at the trial as to the precise date of the construction of the foundation by a prior owner.
6. The foundation was built into the side of a hill on locus. On one end of the foundation, the foundation wall rose seven feet above the ground, and on the other end, at the top of the hill, the foundation wall rose only six inches above the ground. On one side of the foundation wall, there was an approximately eight foot opening to permit access to the structure. Mr. Norton testified, and I so find, that during the ownership of locus by the Nortons, the top of the foundation always had some sort of covering, varying from a tent, to a tarpaulin, to tar paper. When the Nortons first acquired the property in 1974, there were some horizontal wooden members over the top of the foundation. In 1978, Mr. Norton concluded that these were danger *460 ous because they were rotting, and he “pushed” the wood into the foundation and removed it.
7. Both before and for some time after the Nortons acquired the locus, one of their neighbors used the foundation wall structure to store hay. After the Nor-tons acquired the locus, the Nortons stored bicycles, a lawn mower, and other items of personal property in the foundation wall structure. Mr. Norton also raised rabbits within the structure.
8. In 1983, the Nortons applied for, and were granted, a permit to build a 720 square foot building upon half of the twenty-four foot by sixty foot foundation. The building permit granted Mr. Norton permission to “construct barn (24 x 30).” The Nortons constructed a building on the foundation pursuant to this permit. At the higher elevation end of the building, the building appears to be a one story structure, and there was one large room upon entering the front door. At the lower elevation end of the structure, the building appears to be two stories, because the first story opened to that part of the building enclosed by the foundation walls. On this story, there was also one large room. From 1984 until approximately 1996, the building was used for storage of household goods and also for the raising of honey bees. Rough utilities were constructed at the time of the erection of this building in 1984.
9. In late 1995 or early 1996, the Nortons began further construction work on this building, but had not applied for or obtained a building permit. On January 23, 1996, the assistant building inspector issued a stop work order. In February of 1996, the Nortons applied for a special permit pursuant to Section 3.3.2.9 of the by-law. On March 18, 1996, the board conducted a hearing on the application for a special permit, and on May 9, 1996, the board issued its decision denying the special permit.
10. On March 25, 1996, the Nortons applied for a building permit to complete work started in 1983. The permit application further indicated that the proposed use of the structure was three rooms, bathroom, wood stove, and recreation room. The building permit was issued by the building commissioner on April 3, 1996 with the endorsement that the applicants had permission to construct a “recreation building not for use as apartment.”
11. Prior to issuance of this permit, the building commissioner, Garry Rhodes, and Mr. Norton met to discuss the requested building permit. At that meet-, ing, Mr. Norton told the building commissioner that he wanted to continue the work that he had begun in 1983. Mr. Norton further told the building commissioner that the building would be used for weight lifting, and that a bathroom would be installed for purposes of taking a shower. Mr. Norton told the building commissioner that two of the rooms would be used for his weight equipment.
12. Pursuant to the building permit, the Nortons went forward to install the plumbing and heating which had been roughed in in 1983-1984. The Nortons further constructed interior partition walls, such that the building now contains three rooms including a large “recreation room.” The building also contains a wood stove. The kitchen area includes a sink, a stove, and a refrigerator.
13. Mr. Norton testified at trial that unless he and Mrs. Norton receive a special permit for the apartment use, the use that he proposes to make of the building is a “recreational” use for his children and grandchildren. Mr. Norton also indicated that he would continue to use a portion of the building for his raising of bees. On December 4, 1997, at the request of the plaintiffs, the assistant building commissioner made a final inspection of the building for purposes of an occupancy permit. At that time the building commissioner observed the following:
a. Living room furniture in the recreational room
b. Two bedrooms with beds
c. A kitchen area
d. A bar area at which people could eat
e. A wood stove
f. Storage in the basement of the building
g. A deck on the outside of the building
h. A bathroom
CONCLUSIONS OF LAW
In relevant part, paragraph 3.3 of the by-law provides that “no more than one BUILDING for dwelling purposes shall be located upon a LOT,” with the exception provided for by paragraph 3.3.2.9.b.
Paragraph 1.3.3 of the by-law defines “building” as follows: “A STRUCTURE enclosed within exterior walls, built, erected and framed of a combination of any materials, whether portable or fixed, having a roof, to form a STRUCTURE for the shelter of persons, animals or property.”
Paragraph 1.3.16 of the by-law defines the term, “structure" as follows: “A combination of materials assembled to give support or shelter, such as BUILDINGS, towers, masts, sheds, roofed storage areas, mechanical equipment, swimming pools, tennis courts, signs, fences; but not including driveways, walkways and other paved areas, underground storage tanks, septic tanks and septic systems, and accessory facilities associated with the provision of utilities such as drains, well, transformers and telephone poles.”
Finally, paragraph 3.3.2.9 of the by-law provides in relevant part that a special permit from the board shall be required “if the Apartment is to be located within a detached BUILDING located on the same LOT as the BUILDING containing the Principal Unit. Such Special Permit shall only be issued, if the BUILDING in which the Apartment is to be located has been in existence prior to 1950.”
*461 In its decision, the board found that the foundation was in existence prior to 1950. The parties have stipulated that the foundation was constructed in 1950. No additional evidence was presented at trial with respect to the date of the construction of the foundation. Paragraph 3.3.2.9 of the by-law permits an apartment within a detached building only if the building in which the apartment is to be located has been in existence “prior to 1950.” There is no evidence before the Court to the effect that the foundation, even if it were to constitute a building within the meaning of the by-law, has been in existence prior to 1950. Thus, the board could not lawfully grant a special permit to the Nortons.
Even if it is assumed, contrary to the evidence, that the foundation was constructed prior to 1950, this Court concludes that the foundation was a “structure” within the meaning of the by-law, but not a “building” within the meaning of the by-law. Under the by-law, every building is structure, but not every structure is a building. The by-law definition of building requires “exterior walls,” a “framed” structure, and one “having a roof.” While these terms are not defined in the by-law, they must be given an ordinary construction. Needham Postural Counseling Center, Inc. v. Board of Appeals of Needham, 29 Mass.App.Ct. 31, 33 (1990). The concrete foundation wall on top of which was placed at one time wood, and at other times a tent, a tarpaulin, or tar paper, is not a building as defined by the by-law. This conclusion is supported by an evaluation of the apparent intent of paragraph 3.3.2.9.b of the by-law. The first zoning by-law in Action was enacted in 1953. The apparent purpose of paragraph 3.3.2.9.b is to permit an apartment in a detached building which preexisted zoning by some three years or more. Thus, neighbors who had seen and were familiar with detached buildings on a piece of land for many years, might be expected to accommodate themselves to a somewhat different use of that building. What may have been used for agricultural purposes or to house employees during the 1940’s today may be used as an apartment. This rationale is not satisfied by the foundation wall erected in this case.
Because the foundation is not a building within the meaning of the by-law, the board could not lawfully have granted a special permit to the Nortons.
In its decision, the board concluded that the building, presumably making reference to the foundation, “has not been in existence since before 1950, having been demolished (except for the foundation) in 1974 and not reconstructed until 1984.” The Nortons maintain that this conclusion by the board was whimsical and arbitrary. This Court reads the board’s conclusion to simply mean that to the extent that the foundation was a building within the meaning of the by-law, it was altered by the Nortons some time after their acquisition in 1974, and has not existed as a building prior to 1950. In any event, this Court has found the facts de novo as required by G.L.c. 40A, and based upon the facts as found, I conclude that the decision of the board denying the special permit application of the Nortons is not beyond its authority.
In his enforcement complaint, the building commissioner essentially contends that the Nortons use the detached building as an apartment, in violation of paragraph 3.3 of the by-law. The building commissioner argues that the use and the potential use of the detached building extends or may extend well beyond weight rooms and shower facilities. The building commissioner seeks an injunction prohibiting the Nortons from using the detached building as an apartment, and also seeks an affirmative injunction to the effect that the kitchen appliances, including the stove, refrigerator and sink, be removed from the building by the Nortons. The Nortons respond that they completed the improvements to the detached building in 1996 after receiving a permit which allowed the detached building to be used for recreational purposes. The Nortons further contend that none of the kitchen facilities is inconsistent with a recreational use of the detached building.
As conceded by counsel for the building commissioner at trial, the April 3, 1996 building permit for a “recreation building” is of doubtful validity under the by-law. Paragraph 3.2.4 of the by-law provides for a recreation use. This use is defined as “non-commercial outdoor facilities for activities such as horseback riding, skiing, ice skating, swimming and tennis.” Paragraph 3.8 of the by-law provides for uses accessory to a principal use. Accessory uses under the by-law include garages, greenhouses, tool sheds or barns, and a “swimming pool or tennis court provided that such recreational facilities are used only by the residents and their guests.” Neither of these by-law provisions appears to authorize the April 3, 1996 building permit for a “recreation building not for use as apartment.” The building commissioner does not, however, seek the complete removal of all of the improvements made by the Nortons in 1996. Rather, the building commissioner seeks an injunction against apartment use and an affirmative injunction with respect to the removal of the kitchen appliances.
In light of the denial of the special permit pursuant to paragraph 3.3.2.9.b of the by-law, which denial this Court sustains, and in light of the by-law provision set forth in paragraph 3.3 to the effect that no more than one building for dwelling purposes shall be located upon the lot, this Court concludes that the presence of the beds, kitchen sink, stove and refrigerator constitute a violation of the by-law. These facilities are not for recreational purposes but rather make the detached building a “dwelling unit” as defined in paragraph 1.3.5 of the by-law: “A portion of a BUILDING designed as the residence of one FAMILY.” Cf. Commonwealth v. Jaffe, 398 Mass. 50, 55 (1986). The building commissioner argues, persuasively, that his *462 office should not be required to monitor the actual use of the detached building in order to insure that individuals are not sleeping there and taking their meals there.
A permanent injunction will issue as follows:
1. The Nortons shall, within thirty (30) days after this judgment becomes final, remove the beds from the detached building, and remove the kitchen sink, stove and refrigerator. No such item will be installed or replaced in the detached building by the Nortons or their successors in interest.
2. The Nortons and their successors in interest will not permit anyone to sleep overnight in the detached building.