NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13365

HUME LAKE CHRISTIAN CAMPS, INC.  vs.  PLANNING BOARD OF
MONTEREY.


Suffolk.     February 6, 2023. - June 7, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.


Zoning, Exemption, Religious use, By-law.  Religion.


Civil action commenced in the Land Court Department on
August 9, 2019.

The case was heard by Diane R. Rubin, J.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


Donna M. Brewer for the defendant.
Alexandra H. Glover for the plaintiff.
Kate Moran Carter, Ryan Douglas Grondahl, Kathleen M.
Heyer, Nicholas P. Shapiro, & Taylor N. Lee, for Real Estate Bar
Association for Massachusetts, Inc., & another, amici curiae,
submitted a brief.


GAZIANO, J.  In this case we must decide whether the

plaintiff's proposal to build a recreational vehicle (RV) camp

on its campground is an exempted use within the meaning of the

Dover Amendment, G. L. c. 40A, § 3.  The Dover Amendment limits the ability of municipalities to "regulate or restrict the use of land or structures for religious purposes . . . on land owned or leased by . . . a religious sect or denomination."  Id.  The plaintiff, Hume Lake Christian Camps, Inc. (Hume), is a nonprofit Christian organization that operates camps in service of its mission to "evangelize the world."  Hume operates a camp in Monterey and provides to camp attendees chapel sessions, religious instruction, and opportunities for spiritual reflection, as well as secular recreational activities.  Hume applied to the defendant planning board of Monterey (board) to build an RV camp on the grounds of its Monterey property.  The RV camp would be used to house families who attend camp sessions, as well as volunteers and seasonal staff who perform a variety of duties at the camp.  The board denied Hume's application, on the ground that the RV camp would not be an exempt religious use under the terms of the Dover Amendment.

Hume appealed to the Land Court from the board's denial of its application.  Following a trial over three separate days (including a view), in April 2022 a Land Court judge decided that residences for family attendees at the RV camp would serve a predominantly religious purpose and therefore would be exempt under the Dover Amendment.  The judge also concluded that housing volunteers and seasonal staff at the RV camp would serve

a financial, rather than a religious, purpose and accordingly would not be exempt under the Dover Amendment.  The board appealed to the Appeals Court, and Hume filed a cross appeal.  We then transferred the case to this court on our own motion.  We conclude that, because Hume's proposal to build an RV park has as its primary or dominant purpose a religiously significant goal, the RV park would be an exempt religious use.[1]

1.  Background.  We recite the facts based on the trial judge's findings and the parties' stipulation of facts, reserving some facts for later discussion.

a.  Hume Lake Christian Camps.  Hume was founded in 1946 and is based in California.  It describes itself as a nondenominational, conservative, evangelical Christian organization that unites different denominations that all share an evangelical Christian faith.  Hume's fundamental mission is to "evangelize the world."  Its mission statement provides:

> "We desire that each person coming into contact with this global ministry will accept Jesus Christ as their personal savior; grow in their faith and Christian character development; establish the priorities of prayer, Bible study, and Christian Fellowship while associating with the local church; devote their lives in service to our Lord Jesus at home and abroad.  We will continue to emphasize ministries to youth."

Hume carries out this mission through its "camping ministry."

---

[1] We acknowledge the amicus brief submitted by the Real Estate Bar Association for Massachusetts, Inc., and the Abstract Club.

Hume runs camps at three permanent locations, two in California and the third in Massachusetts. It operates its camps according to its interpretation of Christian scripture, which is set forth in its statement of beliefs. Hume is governed by a board of directors of from twelve to fifteen members. Under Hume's bylaws, board members must meet the requirements for elders as set forth in the Bible, in Peter 5:1-4 and Timothy 3:1-7. The Internal Revenue Service has recognized Hume as a religious charity under 26 U.S.C. § 170(b)(1)(A)(i), and as a nonprofit organization under § 501(c)(3) of the Internal Revenue Code.

The judge's findings in large part were based on the testimony of two individuals who were employed by Hume at the time of trial. At that time, Lenny Harris was Hume's director for ministry expansion, and John Szablowski was the senior camp director at Hume's Monterey camp, otherwise known as Hume New England (Hume NE). Harris and Szablowski each testified that Hume's mission is "to teach spiritual principles and to tell people the good news of the Bible in the setting of nature, in the setting of camping." The judge credited both men as having sincerely held beliefs consistent with Hume's statement of

beliefs, and a commitment to sharing their beliefs with others through the work of Hume.[2]

b. Hume NE. Hume first acquired the Hume NE campground in 2012. At the time of trial, Hume NE operated on more than 400 acres of land. Its property included a number of small buildings, as well as a dining hall, two newer and larger residential lodges with gathering spaces, and a small and a large chapel. The smaller buildings served as housing, as well as spaces for activities, storage, and a snack shop.

In order to ensure that its camp furthered Hume's religious mission, Hume NE required that all staff, including seasonal employees, agree to and sign Hume's statement of beliefs. Job postings for counsellors and food service assistants stated that applicants had to agree "with the theological positions, philosophy, and policies of [Hume]." Szablowski was responsible

---

[2] In his testimony, Harris summarized that statement of beliefs:

"We believe that God is the creator. We believe that he created man. That man sinned, was separated from God. We believe that God sent his son, Jesus Christ, as the final sacrifice for man's sin. For those who believe in him in his name and accept him, they are, we refer to[,] as born again. They become believers, Christians. They are assured a place in heaven. We believe that the Bible is inspired by God. It's his inerrant word. We believe that Jesus was killed, died, was buried, was resurrected, and ascended into heaven, is there preparing a place for us, who are believers. And that one day, as believers, we will be in his presence."

for determining whether each job applicant sufficiently was committed to the statement of beliefs to work at the camp. Szablowski testified that, as part of this process, he asked each applicant whether he or she had been baptized as "public declaration of their faith."

Hume NE, which earns income from camper fees, concession sales, and donations, does not generate enough revenue to cover its operating costs. To compensate for an annual deficit of approximately one-third of its operating expenses, the camp has received a substantial amount of financial support from Hume, its parent organization. Additionally, in order to save money, Hume NE relies on the services of volunteers. Volunteers assist with operations, maintenance, and new projects. Hume provides volunteers with housing and free meals in exchange for their labor. Volunteers are not required to sign the statement of beliefs, nor must they agree with Hume's religious precepts.

Hume NE does not host secular corporate retreats or private events on its property. Rather, its campground and facilities are available for use only to campers who attend one of its two types of programs, "program camps" and "guest retreats." As of the date of trial, over sixty-five different churches, serving approximately 4,800 campers, had participated in one of these programs. Another approximately sixty campers had participated as individuals, without any church group.

Program camps are youth camps that typically run for one-week sessions during the summer, and on weekends during the winter. Each year, Hume NE hosts five summer program camps and approximately six winter program camps. Hume NE provides food and lodging to program camp attendees and controls the entire camp experience. This includes religious instruction, twice-daily chapel sessions, performances by worship bands, and recreational activities such as canoeing, basketball, hiking, and ax throwing. Hume views the camp's recreational activities as an important means of attracting interest in attending the camp. Campers also participate in breakout sessions to discuss the morning chapel session with their counsellors, aided by written materials provided by Hume. Hume develops a biblical theme each year for its program camps, with input from youth pastors, in order to connect with youth and encourage them toward faith. Each theme is reviewed and approved by a credentialed theologian.

When a church arranges to participate in a program camp, it typically brings its own congregation members, including adult counsellors. Individual campers who do not sign up for program camps through a church are placed with Hume NE's independently hired counsellors. Hume NE does not require attendees at program camps to sign the statement of beliefs or to profess a belief in Hume's tenets. Attendees, however, must engage in all

activities, including chapel sessions.  Szablowski explained that these policies are in service of Hume's mission to bring religious faith to nonbelievers.

Guest retreats take place on weekends approximately forty weeks each year.  Hume NE rents out its facilities to participating organizations, such as churches, ministries, and mission organizations, which in turn provide their own speakers, worship bands, and activities.  Individuals attend guest retreats through these organizations.  Hume NE provides staffing, lodging, meals, and recreation.  Each organization participating in a guest retreat is required to allow a representative of Hume NE to make a presentation and to share Hume's ministry with the group.

Szablowski testified that he personally screened all groups interested in guest retreats to ensure that their beliefs were aligned with Hume's tenets.  He discussed the statement of beliefs with each group's ministry leader, required each group to sign both the statement of beliefs and a guest group contract, and ensured that each group's schedule included religious components, such as chapel sessions.  While organizations must do so, individual attendees at guest retreats are not required to sign the statement of beliefs, so as not to dissuade nonbelievers from attending.

c. <u>RV camp proposal</u>. In May 2019, Hume submitted to the board an application for site plan review for the construction of an RV camp on Hume NE's grounds. In its application, Hume described the proposed project as a twelve-space camp to accommodate "temporary travel trailers, motorhomes, tents, and seasonal staff housing trailers." These sites would be located in an area somewhat distant from the rest of the campground, but within walking distance of the other facilities. The application explained that, "[a]lthough permanent buildings are part of Hume New England, they are significantly more expensive and require much more construction activity over a longer period of time."

As set forth in the application, the RV camp would be used by three distinct groups of individuals, for three distinct purposes. First, Hume proposed to use the RV camp for a new family camp program, which would provide families with a Christian camp experience while allowing them to remain in their own RVs.[3] In addition, Hume proposed that the RV camp would be used to house volunteers working at Hume NE. Finally, Hume's application proposed that the RV camp would be used to house seasonal, temporary staff during the summer months.

_____

[3] The family camp program also could be used for adult camps hosted in RVs, such as men's or women's retreats.

d.  Monterey's zoning bylaw.  Under Monterey's zoning bylaw, "[a]ny non-municipal educational use or any religious use is subject to site plan review by the [board]."  The bylaw provides that "[n]o dwelling, structure or land or any part thereof shall be used for any purpose unless authorized."  The principal use of a "[t]railer or mobile home park" is prohibited in all zoning districts in Monterey.

2.  Procedural background.  In July 2019, the board sent a letter denying Hume's application to construct the RV camp.  The decision explained:  "After careful consideration, the board voted at the meeting of 7/11/19 to reject the site plan on the grounds that the trailer park is not a customary religious use and should not fall under the umbrella of the Dover Amendment."  The decision also stated:  "The next step is to get clarification from the Mass. Land [C]ourt on this matter for . . . future planning clarity."

Hume timely appealed by filing a complaint in the Land Court.  The parties agreed that there were two issues to be decided at trial:  (1) whether Hume qualified for a religious use exemption in connection with Hume NE, and (2) whether Hume's proposed construction of an RV camp at Hume NE would be exempt from the zoning bylaw pursuant to G. L. c. 40A, § 3.  In an agreed statement of facts filed in the Land Court, the parties agreed that Hume "is a non-profit organization professing

dedication to the ministry of Christianity, with a particular emphasis on providing Christianity-based programs for all ages."

Prior to trial, the judge conducted a view of Hume's property. Trial proceeded by electronic audio-visual conference on April 13 and 14, 2021. In April 2022, the judge issued a decision finding that Hume NE has a religiously significant goal that is the primary or dominant purpose for which the campground is used. The judge overturned on this basis the board's determination that use of the RV camp for campers at the family camp program was not protected by the Dover Amendment.

With respect to Hume's proposal to house volunteers and seasonal staff at the RV camp, however, the judge found that the board's decision was supported by the evidence at trial. The judge concluded that Hume's purpose in allowing volunteers and seasonal staff to use the RV camp was primarily financial and that, hence, such use would not be protected under the Dover Amendment.

3. <u>Discussion</u>. The Dover Amendment precludes a town or other municipality from adopting a zoning ordinance or bylaw that "prohibit[s], regulate[s] or restrict[s] the use of land or structures for religious purposes or for educational purposes on land owned or leased by . . . a religious sect or denomination, or by a nonprofit educational corporation." G. L. c. 40A, § 3. See <u>Martin</u> v. <u>Corporation of the Presiding Bishop of the Church</u>

of Jesus Christ of Latter-day Saints, 434 Mass. 141, 147 (2001) (religious purposes); Trustees of Tufts College v. Medford, 415 Mass. 753, 757 (1993) (educational purposes). The Legislature has imposed this limitation in order to foreclose the "local exercise of preferences as to what kind of educational or religious uses will be welcome." See Newbury Jr. College v. Brookline, 19 Mass. App. Ct. 197, 205 (1985). By the same token, however, the Dover Amendment "honor[s] legitimate municipal concerns that typically find expression in local zoning laws" by "authoriz[ing] a municipality to adopt and apply 'reasonable regulations' concerning bulk, dimensions, open space and parking, to land and structures for which a [protected] use is proposed." Trustees of Tufts College, supra.

The board argues that the judge erred in holding that the use of the RV camp to house families would be exempt under the Dover Amendment. Hume argues instead that the judge erred in holding that the housing of volunteers and seasonal staff in the RV camp would not be exempt. To address these arguments, we first must inquire whether the Dover Amendment's exemptions apply to Hume. See Gardner-Athol Area Mental Health Ass'n v. Zoning Bd. of Appeals of Gardner, 401 Mass. 12, 15-16 (1987) (plaintiff was entitled to Dover Amendment protections because it was nonprofit educational corporation). The Land Court judge answered this question in the affirmative, concluding that Hume

is a religious organization entitled to the protections of the Dover Amendment. The board does not contest this finding on appeal. See Regis College v. Weston, 462 Mass. 280, 284 (2012).

This, however, does not settle the matter. Just because an entity is a religious organization that qualifies for Dover Amendment exemptions, it does not follow necessarily that the entity uses its land or structures for a religious purpose. See Shrine of Our Lady of La Salette Inc. v. Assessors of Attleboro, 476 Mass. 690, 700 (2017). To determine whether a proposed use of land or structures is exempt, we undertake two related -- and at times overlapping -- inquiries. First, we ask whether the proposed use has as its "bona fide goal something that can reasonably be described as" religiously significant. See Regis College, 462 Mass. at 285. Second, we consider whether the religiously significant goal is the "'primary or dominant' purpose for which the land or structures will be used." Id., quoting Whitinsville Retirement Soc'y, Inc. v. Northbridge, 394 Mass. 757, 760 (1985). The primary or dominant purpose requirement ensures that an ostensibly religious purpose is not "mere window dressing" for a nonexempt use (quotation omitted). See Regis College, supra at 287. Whether a proposed use of land or structures is exempt under the Dover Amendment is a mixed question of law and fact, which we review de novo. See McLean Hosp. Corp. v. Lincoln, 483 Mass. 215, 219 (2019) (Dover

Amendment analysis is mixed question of law and fact); McCarthy v. Slade Assocs., Inc., 463 Mass. 181, 190 (2012) ("[m]ixed questions of law and fact . . . generally receive de novo review" [citation omitted]).

In undertaking these inquiries, our focus is on the proposed use of the land or structure, rather than on the land or structure itself. See Worcester County Christian Communications, Inc. v. Board of Appeals of Spencer, 22 Mass. App. Ct. 83, 87 (1986). In McLean Hosp. Corp., 483 Mass. at 215-216, for example, the plaintiff proposed to use its land for a "residential program for adolescent males," and argued that such a use warranted exemption under the Dover Amendment because its purpose was educational. We concluded that, even though the facilities in which the program would be housed did not resemble a "traditional school[]" or "college[]," the proposed program nonetheless had a predominantly educational purpose, because the facilities would be used to "teach[] . . . participants the skills necessary for their success" (citation omitted). Id. at 220, 225. See Worcester County Christian Communications, Inc., supra (radio station, depending on its content, can serve educational purpose).

We do not take a piecemeal approach to these inquiries. Rather, we ask "whether the [land or] structure as a whole is to be used for religious purposes." See Martin, 434 Mass. at 149-

150.  In Martin, supra at 150 n.19, for example, the judge inquired whether each of the particular rooms of a temple independently served a religious purpose.  We held that this "sort of particularized inquiry . . . is inappropriate."  Id.

In addition, "religious purposes" encompass more than just "typical" religious uses, such as worship or religious instruction.  See Shrine of Our Lady of La Salette Inc., 476 Mass. at 697.  The religious purposes exemption covers any use the primary or dominant purpose of which is to "aid . . . a system of faith and worship" (citation omitted).  See Martin, 434 Mass. at 150.  See also Regis College, 462 Mass. at 285 ("We have refused to limit Dover Amendment protection to traditional or conventional educational regimes").  Notably, in determining whether a particular use of land or structures serves a religious purpose, we avoid making judgments as to whether a proposed use constitutes a "necessary element" of a particular religion, as that would constitute "an area of inquiry that the First Amendment to the United States Constitution prohibits." See Martin, supra.

We emphasize that the religious purposes exemption does not require that a proposed use be intrinsically religious in order to serve a religious purpose.  Rather, the exemption also encompasses "a variety of accessory uses" that, while not inherently religious in nature, are components of a broader

religious project, and that facilitate the functioning of that project.  See Needham Pastoral Counseling Ctr., Inc. v. Board of Appeals of Needham, 29 Mass. App. Ct. 31, 37 (1990).  We have suggested, for instance, that a "church parking lot" can be said to serve a religious purpose.  See Martin, 434 Mass. at 149.  Similarly, a snack bar on a school's softball field may serve an educational purpose.  See Bible Speaks v. Board of Appeals of Lenox, 8 Mass. App. Ct. 19, 30, 34 (1979).

We conclude that the proposed RV camp would have as its primary or dominant purpose a religiously significant goal, and so would be exempt under the Dover Amendment.  See Regis College, 462 Mass. at 284.  We reach this conclusion because, under Hume's proposal, the purpose of the RV camp would be to facilitate the operations of and strengthen attendance at Hume NE, whose mission is to cultivate religious practice and spiritual growth.  We note that the judge erred by inquiring into whether each individual use of the RV camp would be exempt under the Dover Amendment.  Rather, the RV camp is a single structure and therefore is subjected to a single instance of the religious purpose test.  See Martin, 434 Mass. at 149-150 & n.19.  We begin by discussing the housing of family attendees at the RV camp.

a.  Use of RV camp for family camp program.  We conclude that the primary or dominant purpose of housing families at the

RV camp would be to serve Hume's religious mission by strengthening attendance at the proposed family camp program. The judge found that the family camp program would be centered around Hume's evangelical faith, with chapel, worship, and religious instruction interspersed with recreational activities throughout each day. In addition, Hume NE would provide opportunities for intrafamily religious discussions. The judge determined that the goal of the program is to promote the spirituality of the family unit. See Regis College, 462 Mass. at 292-293 (fact finder permissibly could conclude that program served educational purpose on basis of plaintiff's affidavits about program's goals).

Under Hume's proposal, families would reside at the RV camp solely to attend the family camp program; families not in attendance at the program would be excluded from the campground. Contrast Lasell Village, Inc. v. Assessors of Newton, 67 Mass. App. Ct. 414, 420, 423 (2006) (dominant purpose of retirement community was not educational in part because "residents were not required to devote a substantial portion of their time to educational pursuits"). Moreover, Hume anticipates that, by permitting families to bring their own RVs, the RV camp would present a less costly alternative to staying at one of the camp's lodges, rendering the family camp program more affordable. The RV camp also would aid the family camp program

by serving as a location at which families would be expected to engage in scheduled religious discussions and spiritual reflection. See Needham Pastoral Counseling Ctr., Inc., 29 Mass. App. Ct. at 33. The RV camp would thus strengthen attendance at and participation in the family camp program, in accordance with Hume's mission to "invest in the spiritual life . . . of the family." See Regis College, 462 Mass. at 281, 292-293 (residential facilities may serve educational purpose if residents engage in educational activities).

The board maintains that families' use of the RV camp would not serve a religious purpose because staying in a trailer home is not a religious activity. This argument applies the religious purposes test too narrowly. See Martin, 434 Mass. at 149. As discussed, a use of land or structures can serve a religious purpose without itself being a form of religious practice. See id. at 150 n.19. Cooking food, for example, in itself may not be a religious activity, but a kitchen nonetheless serves a religious purpose if it is used to feed the members of a congregation. See id. at 149-150. Likewise, under Hume's proposal, the RV camp would provide lodging to families so that they could attend a religious camp program. See Matter of Hapletah v. Assessor of Fallsburg, 79 N.Y.2d 244, 250-251 (1992) ("If petitioner was unable to provide residential housing accommodations to its faculty, staff, students and their

families, its primary purposes of providing rigorous religious and educational instruction at the yeshivah would be seriously undermined").

Having determined that the purpose of housing families at the RV camp would be to advance Hume's religious mission, we next turn to whether the same can be said for the housing of volunteers and seasonal workers at the RV camp.

b. Use of RV camp to house volunteers and seasonal workers. Hume contends that the primary or dominant purpose of housing volunteers and seasonal staff at the RV camp would be to facilitate the operation, maintenance, and improvement of Hume NE, and thereby supports Hume's religious mission. We agree.

The judge found that volunteers are a "critical part of the business model of Hume NE" and are "heavily relied upon" to perform work such as assisting with outdoor projects and maintenance. At the time of trial, Hume NE was annually hosting approximately 200 volunteers, each of whom stayed at the camp anywhere from one day to one week or longer. Szablowski testified that having two volunteers stay in an RV at Hume NE for eight weeks during the summer would save the camp approximately $8,600 annually.

In housing volunteers at the RV camp, Hume's goal is for Hume NE to benefit from their labor. Under Hume's proposal, the

RV camp would provide volunteers with "a place to stay when permanent housing is not available due to the camp being otherwise full."  In addition, Harris testified that groups of Christian volunteers sometimes travel together in their RVs and work in exchange for the use of a camp's RV site; the RV camp therefore could entice itinerant volunteers to donate their labor to the camp.

The same reasoning applies to Hume's proposed use of the RV camp to house seasonal staff during the summer.  Seasonal staff at Hume NE, a category that includes camp counsellors, kitchen staff, and grounds people, perform work that is necessary to the camp's operations.  See Shrine of Our Lady of La Salette Inc., 476 Mass. at 697 (cafeteria and bistro were "connected with religious worship" because "[p]ilgrims and visitors who spend hours at the [s]hrine need to eat and drink" [quotation and citation omitted]).  See also Bible Speaks, 8 Mass. App. Ct. at 30 ("feeding and housing of college personnel" serve educational purpose).  Furthermore, according to Hume's application, by providing supplemental housing to workers during the summer, the RV camp would allow Hume NE to use its limited number of beds for paying campers rather than for staff, expanding the capacity of the camp.

Because Hume NE exists to advance Hume's religious mission, it follows that the purpose of housing volunteers and seasonal

workers at the RV camp is a religiously significant goal. See Needham Pastoral Counseling Ctr., Inc., 29 Mass. App. Ct. at 37 (accessory uses may be encompassed by religious purposes exemption). The judge held otherwise, finding that even though Hume NE has a predominantly religious purpose, volunteers' tasks are nonetheless "secular in nature" and "bear no relation to Hume's religious mission other than reducing Hume NE's operating costs." As discussed, however, this application of the religious purposes test is too narrow. A religious organization may depend upon secular tasks, such as the provision of food and housing, in order to operate effectively. See Shrine of Our Lady of La Salette Inc., 476 Mass. at 697. See also Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter Day Saints v. Ashton, 92 Idaho 571, 574-575 (1968), quoting Matter of the Community Synagogue v. Bates, 1 N.Y.2d 445, 453 (1956) ("To limit a church to being merely a house of prayer and sacrifice would, in a large degree, be depriving the church of the opportunity of enlarging, perpetuating and strengthening itself and the congregation"). If each use of land or structures itself had to be a "religious" use, it would be virtually "impossible" for any organization to benefit from the Dover Amendment's religious purposes exemption. See Martin, 434 Mass. at 149.

This court's broad understanding of what constitutes a "religious purpose" is set forth in some detail in Shrine of Our Lady of La Salette Inc., 476 Mass. at 695. There, a religious organization sought a tax exemption for a maintenance building that stored maintenance vehicles and equipment used to maintain its property, as well as religious items. See id. We concluded that the maintenance building had a dominant purpose that was "connected with religious worship and instruction," because "maintaining the [s]hrine and its grounds . . . is connected with the religious worship and instruction offered at [the property]." See id. at 699-700. Here, similarly, volunteers and seasonal workers would reside at the RV camp in order to assist in maintaining the camp's property and operating its programs. Accordingly, this use of the RV camp would be connected to the camp's religious purpose.

The board argues that the judge properly affirmed the denial of Hume NE's application because, as the judge reasoned, Hume NE is primarily motivated to house volunteers and seasonal staff at the RV camp in order to defray costs, rather than for religious purposes. This is because, the board maintains, as Szablowski testified, housing workers at the RV camp would allow Hume NE to avoid the costs associated with constructing more permanent buildings.

This argument misconstrues the religious purposes test. The board focuses on Hume NE's decision to house workers in RVs rather than in permanent housing. The focus of this court's analysis, however, has never been on an organization's reason for choosing one means of pursuing its goals rather than another. See Martin, 434 Mass. at 150 (once it is determined that sacred ceremonies are conducted in temples, "[n]o further inquiry as to the applicability of the Dover Amendment [to a temple] was warranted"). Rather, we look to the purpose of the particular use to which the land or structure is put. See id. at 149. Here, the reason that Hume NE wants to house workers in the RV camp is so that their labor may assist the camp in carrying out its religious goals. Accordingly, this use of the RV camp would serve a religious purpose. See Worcester County Christian Communications, Inc., 22 Mass. App. Ct. at 87 ("focus must be placed on the use of the structure").

c. Hume's religion mission. The board argues that, even if the RV camp would serve Hume NE in carrying out its operations, this would not constitute a religiously significant goal because Hume NE's primary or dominant purpose is recreation, and not religious practice.

We disagree with the board's characterization of Hume NE's purpose. As the judge found, the primary or dominant purpose of Hume NE is to serve Hume's evangelical mission. Harris and

Szablowski, in testimony that the judge found credible and honest statements of belief, described Hume NE's purpose as being to cultivate religious experiences for believers and nonbelievers alike. See Commonwealth v. DeMinico, 408 Mass. 230, 244 (1990) ("Questions of credibility are . . . for the trial judge to resolve" [citation omitted]). This purpose is clearly set forth in Hume's mission statement, which articulates Hume's desire that "each person coming into contact with [Hume's] ministry will . . . [a]ccept Jesus Christ as their personal Savior." See Commissioner of Code Inspection of Worcester v. Worcester Dynamy, Inc., 11 Mass. App. Ct. 97, 99 (1980) (nonprofit corporation's belief that its program serves educational goals is "entitled to due weight").

The camp's programming, which is directed and controlled by Hume NE, bears out this purpose. See Regis College, 462 Mass. at 292. Program camp attendees are required to participate in two chapel sessions each day and to receive religious instruction in accordance with a biblical theme that is reviewed by a theologian. See id. (mandatory academic requirement of "two academic courses each semester" bolstered assertion that program served educational purpose). Contrast Needham Pastoral Counseling Ctr., Inc., 29 Mass. App. Ct. at 36 (program does not serve religious purpose in part because "[c]ounselors do not espouse to their clients any particular religious doctrine").

Similarly, the camp's guest retreats are available only to organizations that agree to abide by a schedule that includes religious components.  According to Szablowski, he rejected at least three groups from participating in a guest retreat, two because they were secular organizations, and one because its humanist theology was inconsistent with Hume's statement of beliefs.

The board maintains that, because recreation, rather than religious practice, is the primary draw for campers in choosing to attend the camp, Hume's religious mission cannot be described as Hume NE's primary or dominant purpose.  The board points to Szablowski's testimony that the camp would "have a difficult time attracting families" in the absence of recreational activities.  The board additionally observes that campers are not required to belong to a church or profess a particular faith in order to attend the camp.

We are not persuaded.  Although the recreational activities "conducted on the [camp's] properties are [not] inherently religious in nature," they nonetheless serve to promote Hume's religious goals.  See Maurer v. Young Life, 779 P.2d 1317, 1327, 1331-1332 (Colo. 1989) ("by engaging the attention of young persons in camping activities and then directing the youths' attention to the religious meaning to be gleaned from these experiences the entire camping experience becomes a form of

religious worship"). As discussed, the religious purposes exemption is not limited to uses that are typical of or inherent to religious institutions. See Shrine of Our Lady of La Salette Inc., 476 Mass. at 697-698. The judge found that Hume NE offers recreational activities in order to boost interest in the camp's religious offerings, as well as to cultivate an environment in which individuals are likely to develop their faith. See Cummington Sch. of the Arts, Inc. v. Assessors of Cummington, 373 Mass. 597, 605 (1977) ("The fact that participants spent part of their time in recreational activities would not undermine a use which is otherwise educational"). See also Supervisor of Assessments of Carroll County v. Peter & John Radio Fellowship, Inc., 274 Md. 353, 356-363 (1975) (children's camp was "used for religious purposes," notwithstanding its "western frontier theme" that was used to attract young campers who were "not running with glee to hear the Gospel or [to go] to church").

Further, to the extent that Hume NE allows "nonbelievers" to attend camp programs, it does so in service of proselytization. As Szablowski testified, "if we were only to allow believers here, this would be more of a . . . club and not really meet that evangelistic nature." See Lutherans Outdoors in S.D., Inc. v. South Dakota State Bd. of Equalization, 475 N.W.2d 140, 146 (S.D. 1991) (whether purpose of summer camp is

religious is not determined by "the percentage of religious society members among those who make use of the facility"). Contrast <u>Needham Pastoral Counseling Ctr., Inc</u>., 29 Mass. App. Ct. at 36 (counselling program does not serve religious purpose in part because counsellors "do not proselytize").

We conclude that the primary or dominant purpose of Hume NE is to advance Hume's evangelical mission. Because all of the proposed uses of the RV camp would serve to aid Hume NE in carrying out this mission, we further conclude that the primary or dominant purpose of the RV camp would be a religiously significant goal. Accordingly, the proposed RV camp would be an exempt use under the Dover Amendment.[4]

4. <u>Conclusion</u>. The judgment of the Land Court affirming the planning board's determination is vacated and set aside. The matter is remanded to the Land Court for entry of a judgment finding that the proposed RV park would be an exempt religious use and for further proceedings consistent with this opinion.

<u>So ordered</u>.

---

[4] Because we conclude that the RV camp is subject to the religious purposes exemption, we do not address Hume's argument that the RV camp additionally would serve a religious purpose by exposing volunteers and seasonal staff to opportunities for spiritual growth.